[Cite as *State v. Group*, 2011-Ohio-6422.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | CASE NO. 10 MA 21 |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| - VS - | ) | OPINION |
| | ) | |
| SCOTT A. GROUP, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:     Criminal Appeal from Common Pleas
                             Court, Case No. 97 CR 66.

JUDGMENT:                    Affirmed.

APPEARANCES:
For Plaintiff-Appellee:       Attorney Paul J. Gains
                             Prosecuting Attorney
                             Attorney Ralph M. Rivera
                             Assistant Prosecuting Attorney
                             21 W. Boardman St., 6th Floor
                             Youngstown, OH 44503

For Defendant-Appellant:      Attorney John B. Juhasz
                             7081 West Blvd., Suite 4
                             Youngstown, OH 44512

                             Attorney John P. Laczko
                             3685 Stutz Drive, Suite 100
                             Canfield, OH 44406

JUDGES:
Hon. Mary DeGenaro
Hon. Cheryl L. Waite
Hon. Joseph J. Vukovich

                             Dated: December 8, 2011

DeGenaro, J.

{¶1} Defendant-Appellant, Scott A. Group, appeals the December 31, 2009 decision of the Mahoning County Court of Common Pleas denying his petition for post-conviction relief in this capital case. On appeal Group argues that the court erred by dismissing each of the 13 grounds for relief he raised in his petition. Group also argues that the trial court erred by failing to permit him to conduct discovery and by failing to conduct an evidentiary hearing.

{¶2} Upon review, all of Group's arguments are meritless. A petitioner has no right to discovery during post-conviction proceedings. And the trial court properly dismissed each of Group's claims without holding a hearing. The majority of his claims are barred by res judicata as they are not supported by cogent evidence de hors the record. With regard to the few remaining claims which have some support outside the record, they fail to demonstrate substantive grounds for relief. Accordingly, the judgment of the trial court is affirmed.

## Facts

{¶3} In Group's direct appeal from his capital convictions, the Supreme Court of Ohio described the facts of the offense:

{¶4} "On January 18, 1997, the appellant, Scott A. Group, shot Robert Lozier to death during a robbery. * * *

{¶5} "Robert Lozier's wife, Sandra Lozier, owned the Downtown Bar in Youngstown, Ohio. In late September 1996, the Loziers began buying wine and other merchandise from Ohio Wine Imports Company. Group, who was then employed as a deliveryman for Ohio Wine, made weekly deliveries to the Downtown Bar. Group never asked the Loziers to sign or initial a copy of the invoice when they took delivery, a practice Mrs. Lozier characterized as unusual.

{¶6} "On December 12, 1996, Group brought his cash receipts to the Ohio Wine warehouse manager's office to be counted and compared against his invoices. Group's cash receipts were approximately $1,300 short. Although the police were notified, Group was never charged with stealing the missing money.

{¶7} "About a week before Robert Lozier's murder, Group went to the Downtown

Bar and asked Mrs. Lozier to show him the bar's copies of invoices from Ohio Wine.

**{¶8}** "Less than a week before Robert Lozier's murder, two Ohio Wine employees saw Group with a revolver at work. They told him to take the gun out of the building, since possessing a firearm in the warehouse was illegal.

**{¶9}** "The day before the murder, Group quit his job at Ohio Wine. That night, two witnesses saw Group at the Downtown Bar. One of them, Robert Genuske, who worked at the bar, recalled that a few weeks earlier, Group had come to the bar looking for Mr. or Mrs. Lozier because he wanted to talk to them about an invoice.

**{¶10}** "The next day, January 18, the Loziers arrived at the Downtown Bar around 10:00 a.m. It was a cold day and Robert Lozier went upstairs to see whether the pipes had frozen. Sandra Lozier went to an office, opened a safe, removed five bags containing approximately $1,200 to $1,300 in cash, and set them on her desk.

**{¶11}** "As she counted the cash, Mrs. Lozier heard a knock at the bar's front door. She went to the door, looked through the peephole, and saw Group. Mrs. Lozier recognized Group and let him in. She noted that he was wearing tennis shoes, jeans, a dark blue sweatshirt, and an undershirt. She particularly noticed that he wore both a sweatshirt and an undershirt because Group 'never dressed that warmly.'

**{¶12}** "Group told Mrs. Lozier that he wanted to check the invoices again. Mrs. Lozier led him to the office. As Mrs. Lozier and Group searched through the invoices, Robert Lozier came into the office, sat at the desk, and took over counting the money. As Mrs. Lozier later testified, '[Group] just kept going through [the invoices], and it was like he just kept staring at them.'

**{¶13}** "Asking to use the restroom, Group left the office briefly. When he returned, he had a gun. Group ordered the Loziers to put their hands up and get into the restroom. Mrs. Lozier told Group to take the money, but Group replied, 'This isn't about money.' He forced the Loziers into the restroom at gunpoint and made them put their hands against the wall.

**{¶14}** "Group stated that 'he was the brother of the girl that was missing.' Mrs. Lozier interpreted this as a reference to Charity Agee, a murder victim who had last been

seen at the Downtown Bar on New Year's Eve. The Loziers turned around, but Group ordered them to face the wall. Then he shot them both. He shot Robert Lozier once in the head. He shot Sandra Lozier twice: once in the back of the neck and once near her temple.

{¶15} "Mrs. Lozier lost consciousness. She woke to find her husband dead on the floor. Mrs. Lozier thought she was dying, so she tried to write 'Ohio Wine' on the floor in her own blood as a clue for the police. At the time, she did not know Group's name. She then crawled to the office, where she managed to dial 911. She told the operator that 'the delivery man from Ohio Wine' had shot and robbed her and her husband. The 911 call was recorded; a voice timestamp on the tape established that the call was received at 11:05 a.m.

{¶16} "The first Youngstown police officer to arrive at the crime scene was Detective Sergeant Joseph Datko. Mrs. Lozier told Datko: 'The Ohio Wine man shot me. The Ohio Wine man. Our delivery man shot us.' The money the Loziers had been counting before the shootings was gone and so was the box of invoices that Group had been looking through.

{¶17} "At trial, Group, his family, and a family friend gave a different account of Group's whereabouts. Group testified that, after driving his foster son to work around 7:30 a.m., he went back to his apartment, gathered some dirty laundry, and went to his mother's house to wash it, arriving around 9:00 or 9:30 a.m. He testified that he did not know what time he had left his mother's house. Group's mother, grandmother, and sister were at Group's mother's house that morning, along with Francisco Morales, a friend of the Group family. The accounts given by these witnesses generally indicated that Group had arrived at his mother's house by 9:00 a.m. and had left between 11:30 and 11:40 a.m.

{¶18} "According to Group, after leaving his mother's house, he drove to the Diamond Tavern in Campbell, Ohio. Group testified that he did not know how long he was at the tavern but that he had left at noon.

{¶19} "There were about eight customers at the Diamond Tavern. Group bought

at least two rounds of drinks for all of the customers. A fellow patron thanked Group and said, 'I'll see you,' but Group replied, 'You aren't going to see me anymore.' He had a similar exchange with the bartender, Bonnie Donatelli.

{¶20} "Group then drove to the VFW post, which took about five minutes. The manager, Maria Dutton, was a friend of Group's. According to Dutton, Group arrived slightly after noon and left at 12:55 p.m. While there, Group bought a round of drinks for everyone.

{¶21} "Group then drove to a grocery store and telephoned his mother. According to his mother, she received the call between 1:00 and 1:30 p.m. Mrs. Group told her son that Youngstown police were looking for him in connection with a shooting downtown. According to Group, he knew that he had not been downtown, so he surmised that his mother misunderstood the situation and that the police were actually looking for him because of some unpaid parking tickets. Group told his mother that he would go to the police station. Group's mother and sister intercepted him en route and went to the station with him.

{¶22} "When Group arrived at the police station, he spoke with Captain Robert Kane, chief of detectives, and Detective Sergeant Daryl Martin. Kane and Martin noticed what looked like blood on one of Group's tennis shoes. When questioned about it, Group told Kane that he had cut his finger. He showed Kane the finger, and there was a cut on it, but it 'looked like a superficial old cut' to Kane.

{¶23} "After brief questioning, Sergeant Martin arrested Group. Group said, 'You better check out Sam Vona,' a former driver for Ohio Wine. But Mrs. Lozier did not recognize Vona's picture when Martin later showed it to her.

{¶24} "Group's shoe was sent to Cellmark Diagnostics for DNA testing. An expert from Cellmark testified that the DNA pattern of the blood on the shoe matched the DNA pattern of a known sample of Robert Lozier's blood. She further testified that the same DNA pattern occurs in approximately 1 in 220,000 Caucasians, 1 in 81 million African-Americans, and 1 in 1.8 million Hispanics. The testing also revealed that Group was excluded as the source of the blood.

**{¶25}** "Lisa Modarelli, an Ohio Wine sales representative, was a friend of Group's. According to Modarelli, Group confided to her that police had swabbed his hands to test for gunshot residue and that he was concerned that the test might be positive because he had been shooting a gun the day before the murder with 'a friend.' Later, Group told Modarelli that he had been shooting with his foster son, but Group's foster son denied that he had gone shooting with Group.

**{¶26}** "Group contacted Bonnie Donatelli from jail and asked her to contact Darryl Olenick for him. Olenick was a regular at the Diamond Tavern; his hobbies were gun collecting and target shooting. Group told Donatelli that the police had found gunshot residue on his hands and asked Donatelli to get Olenick to tell police that he and Group had been target shooting together the day before the murder. In fact, Olenick and Group did not associate outside the tavern and had never gone shooting together. Donatelli promised to 'see what [she] could do,' but instead, she told Sergeant Martin about Group's request.

**{¶27}** "Robert Clark was an inmate at the Mahoning County Jail with Group. Clark mentioned to Group that he 'was familiar with the people in the [Downtown] [B]ar.' Group asked Clark whether he would 'be willing to help [Group] out.' Group then made up a story for Clark to tell police. Clark was to say that he had been near the Downtown Bar on the morning of the murder and had seen a man leave the bar carrying a large beer bottle box. In return, Group promised to help Clark 'any way he could.' Clark later received an anonymous $50 contribution to his commissary account.

**{¶28}** "Adam Perry was another Mahoning County Jail inmate at the time of Group's pretrial incarceration. Awaiting trial on pending charges, Perry was incarcerated with Group from December 1997 to May 1998. Perry was released on bond in May 1998.

**{¶29}** "In a letter postmarked March 20, 1998, before Perry's release, Group begged for Perry's help with his case:

**{¶30}** " 'If you do bond out, let me know. There's something you may be able to do to help me with concerning my case. And I'm telling you, I need all the help I can get. * * * But seriously man, and this is no joke, I need your help with something if you get out.

Please don't leave me hanging?  We've known each other a long time and if anyone in your family needs help, you know I'll be there.'

{¶31}  "Before Perry was released, Group asked him to firebomb Mrs. Lozier's house.  Group assured Perry that Mrs. Lozier no longer lived there.  However, he told Perry that '[h]e didn't want Sandy Lozier to testify against him,' and he wanted Perry to 'firebomb the lady's house to either scare her from testifying or to lead the police into investigating others.'

{¶32}  "Group told Perry that he had $300,000 hidden away.  He offered Perry half of it in exchange for his help.  Group also offered to dissuade a witness from testifying in Perry's trial.

{¶33}  "Group explained to Perry how to make a firebomb by mixing gasoline with dish soap in a bottle, with a rag in the neck for a fuse.  He instructed Perry to light the rag and throw it through the front window and then to drop a key chain with the name 'Charity' on it on the front lawn.  '[W]hat he wanted to do,' Perry explained, 'was to mislead the police into thinking that the firebomb and the murder [sic] was all involved as far as Charity's abduction and murder.'

{¶34}  "In a letter postmarked May 6, 1998, Group wrote to Perry: 'So I need to know on everything if that party is still on where your sister lived.  The party has to happen and happen the way we last talked.  I've got to know bro, so I can figure some other things out in the next few weeks.'  Perry understood 'the party' to refer to the planned firebombing of Mrs. Lozier's house.

{¶35}  "Group also corresponded with Perry after Perry's release.  State's Exhibit 37, a letter from Group to Perry, contains the following passage: '[Y]ou said you would take care of that flat tire for me and now that your [sic] out, I hope you do because it's a matter of life or death (mine)[.]'  In the next sentence, Mrs. Lozier's address appears next to the name 'Agee.'

{¶36}  "Group then wrote: 'If you take care of the flat, please take care of it with that two step plan we talked about. * * * Theres [sic] $300,000.00 in a wall of a certain house * * *.  Half goes to you to do what you like.'

{¶37} "The second page of State's Exhibit 37 contains Mrs. Lozier's address and describes the house as ranch-style. It also lists the following items: 'Cheap key chain or ID bracelet-name (Charity)' and '3 liter wine jug-mix gas & dish soap.'

{¶38} "In June 1998, Perry knocked on Mrs. Lozier's door. When she answered, he asked her whether a 'Maria something lived there.' Mrs. Lozier said no, and Perry left. Perry testified that he did not want to hurt Mrs. Lozier and so, after finding her at home, he took no further action. Perry later told the prosecutor about Group's plan.

{¶39} "Group was indicted for the aggravated murder of Robert Lozier under R.C. 2903.01(B). The aggravated-murder count had two death specifications: R.C. 2929.04(A)(5) (purposeful attempt to kill two persons) and R.C. 2929.04(A)(7) (murder during aggravated robbery). The indictment also contained a count charging Group with the attempted aggravated murder of Mrs. Lozier on January 18, 1997, and a count charging aggravated robbery, R.C. 2911.01(A)(1). Each count had a firearm specification, R.C. 2941.145(A).

{¶40} "After Perry told the prosecutor about the firebombing plan, a superseding indictment was filed, containing the above counts plus two new ones: (1) the attempted aggravated murder of Mrs. Lozier 'on or about or between April 1, 1998 and June 5, 1998,' and (2) one count of intimidating a witness-Mrs. Lozier-'on or about or between December 1, 1997 and June 5, 1998.'

{¶41} "Group was convicted on all counts and specifications. After a penalty hearing, he was sentenced to death." *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, at ¶1-38.

### Procedural History

{¶42} The Ohio Supreme Court affirmed Group's convictions and sentence on December 2, 2002. Id. While his direct appeal was pending, Group filed a timely petition for post-conviction relief with the Mahoning County Court of Common Pleas on March 30, 1999.

{¶43} Notably, there was a substantial delay in appointing counsel for Group's post-conviction matter. The transcript of proceedings of Group's direct appeal to the Ohio

Supreme Court was filed on September 22, 1999, thus triggering the beginning of the 180-day time period within which to file a petition for post-conviction relief. On December 9, 1999, Group filed a pro-se motion for appointment of counsel which the trial court overruled on December 15, 1999. This was an error by the original judge (Cronin) on the case as R.C. 2953.21(I)(1) provides:

{¶44} "If a person sentenced to death intends to file a petition under this section, the court shall appoint counsel to represent the person upon a finding that the person is indigent and that the person either accepts the appointment of counsel or is unable to make a competent decision whether to accept or reject the appointment of counsel. The court may decline to appoint counsel for the person only upon a finding, after a hearing if necessary, that the person rejects the appointment of counsel and understands the legal consequences of that decision or upon a finding that the person is not indigent."

{¶45} Group refiled his pro-se motion for appointment of counsel on December 22, 1999, and it was again overruled by Judge Cronin. Attorney Renee Green was eventually contacted by the Ohio Public Defender Commission and filed the post-conviction petition on Group's behalf. Because of the delay in appointing counsel, Attorney Green had less than 60 days to prepare the petition.

{¶46} After filing the petition, Attorney Green was permitted to withdraw as counsel on February 27, 2002 and substitute counsel was appointed by the trial court. On October 18, 2002, the State filed a motion for summary judgment.

{¶47} On February 26, 2003, the Ohio Supreme Court ordered Group's death sentence stayed pending the exhaustion of all proceedings for post-conviction relief before courts of this state, including appeals.

{¶48} The case then lingered in the trial court for many years. Group filed several motions to amend or supplement his petition, but did not immediately do so. Finally, on June 7, 2007, Group filed a brief in opposition to the State's motion for summary judgment. On June 13, 2007, the State filed a proposed entry granting its summary judgment motion. Just three days before her retirement from the bench, Judge Cronin signed the proposed entry granting summary judgment, which was time-stamped July 3,

2007. Notably, however, that entry contained no findings of fact or conclusions of law.

**{¶49}** Group made several requests for findings of fact and conclusions of law which were unresolved by the trial court. Group filed a motion to have the case reassigned to a new judge on March 3, 2008.

**{¶50}** On November 12, 2008, visiting Judge Curran was appointed by the Chief Justice of the Ohio Supreme Court to preside over the case. Group filed a pro-se motion for dismissal of his post-conviction counsel (Attorney John Laczko), and for appointment of new counsel. Instead of dismissing Attorney Laczko, the trial court added Attorney John Juhasz as co-counsel.

**{¶51}** On February 2, 2009, Group filed a motion to vacate the trial court's earlier grant of summary judgment and motion for leave to amend his petition.

**{¶52}** The court held a status conference on February 5, 2009, which was attended by Group, his attorneys, and the prosecutor. The court ultimately granted Group's motion to amend his petition, and thus set aside its previous July 3, 2007 order granting summary judgment.

**{¶53}** In his amended petition, filed on June 19, 2009, Group asserted 13 grounds for relief, 12 of which alleged ineffective assistance of trial counsel. Attached to the amended petition were various exhibits, including affidavits from Group, his mother, Ruth, and one of his appellate attorneys, Annette Powers. He also attached several other documents including: delivery invoices from the Ohio Wine Company; DVDs with television and news stories; newspaper articles, gunshot residue and other tests result reports by BCI, and several unauthenticated documents and photographs, including photographs of his shoes, which were purportedly taken by post-conviction counsel years after trial. The State filed a motion for summary judgment. Group filed a brief in opposition, and moved the trial court to conduct discovery, or in the alternative for an appointment of an expert witness.

**{¶54}** On December 31, 2009, the trial court issued an Opinion and Judgment Entry granting summary judgment in favor of the State and against Group on his petition for post-conviction relief, and, in the alternative, dismissing the petition without a hearing.

This opinion included detailed findings of fact and conclusions of law, and the trial court decided to treat the amended petition as an original petition for post-conviction relief, not a successor, since Group's timeline for filing the original petition was cut short due to the delay in appointing counsel. In that entry, the court also overruled Group's request to conduct discovery and for appointment of an expert. Group filed a timely notice of appeal from that judgment on January 29, 2010.

**Failure to Permit Discovery**

{¶55} In his second of two assignments of error, which are discussed in reverse order for ease of analysis, Group asserts:

{¶56} "The Trial Court Erred and Abused its Discretion in Denying the Petition Without Conducting an Evidentiary Hearing or Permitting Discovery, thus depriving Appellant of liberties secured by U.S. CONST. amend. XIV, and OHIO CONST. art. I §§1, 2, 10, and 16, including meaningful access to the courts of this State.".

{¶57} "The long-standing rule in Ohio is that a convicted criminal defendant has no right to additional or new discovery, whether under Crim.R. 16 or any other rule, during postconviction relief proceedings." *State v. West*, 7th Dist. No. 07 JE 26, 2009-Ohio-3347, at ¶15, citing *State ex rel. Love v. Cuyahoga Cty. Prosecutor's Office* (1999), 87 Ohio St.3d 158, 159, 718 N.E.2d 426 (per curiam) certiorari denied (2000), 529 U.S. 1116, 120 S.Ct. 1977, 146 L.Ed.2d 806; and *State v. Gulertekin* (June 8, 2000), 10th Dist. No. 99AP-900 (there is no right to discovery of evidence outside the record in postconviction proceedings). See, also, *State v. Ahmed*, 7th Dist. No. 05-BE-15, 2006-Ohio-7069, at ¶38; *State v. Twyford* (March 19, 2001), 7th Dist. No. 98-JE-56 (both reaching the same conclusion.) The civil rules governing discovery likewise do not apply in a post-conviction relief proceeding. *West* at ¶16.

{¶58} Group maintains, however, that discovery is necessary in a post-conviction matter to allow for any meaningful review. He insists that discovery is especially essential for post-conviction petitions that raise ineffective assistance of trial counsel claims, since it is unlikely that trial counsel would willingly provide an affidavit admitting his or her ineffectiveness. Similarly, he claims it is obtuse to expect that a physician would search

through and provide old records absent a court order to do so.

{¶59} In support of his argument regarding discovery, Group cites to a recent concurrence by Judge Belfance of the Ninth District in *State v. Craig*, 9th Dist. No. 24580, 2010-Ohio-1169:

{¶60} "In this case, this Court has properly cited to precedent holding that a person has no right to discovery in post-conviction proceedings and has no right to funds for an expert witness. However, the fact that a person convicted of a crime may not have a constitutional right to these remedies begs the question. There may be some cases where access to such remedies is compelling and indeed can implicate other constitutional concerns. I am troubled by the sweeping language of judicial decisions that suggest that these remedies are foreclosed as a possibility in every case. The simple fact that there are recent examples of wrongful convictions throughout this state suggests not only the necessity for postconviction relief but the need for access to the means of pursuing such relief. The precedent cited by this Court's opinion broadly pronounces that a criminal defendant has no rights and by implication no access whatsoever to these remedies. Thus, relief in the exceptional case may be precluded, notwithstanding the presence of clearly compelling and meritorious reasons to grant access to discovery or an expert.

{¶61} "I concur with the result reached by the Court in this case. I understand that the interests in finality of judgments and protecting scarce judicial resources are central concerns in considering postconviction relief. However, I hope we do not lose sight of the important rights that should be protected in the postconviction relief process." Id. at ¶47-48 (Belfance, J., concurring.)

{¶62} We agree with the sentiments expressed in this concurrence and hold that discovery should be permitted in certain exceptional post-conviction cases. Although a post-conviction matter is a collateral civil proceeding, we must take care not to view the process so myopically as to completely lose sight of a defendant's rights. We find support for this conclusion from legal trends in other areas of Ohio law concerning this civil-criminal dichotomy; for example, within the evolution of Supreme Court jurisprudence

regarding sex offender notification and registration (SORN) laws. See *State v. Williams*, 129 Ohio St.3d 344, 2011-Ohio-3374, 952 N.E.2d 1108, at ¶16 (breaking from prior case law to conclude that the SORN statutory scheme had lost its civil/remedial character and become exclusively criminal/punitive in nature.)

**{¶63}** That said, we are constrained, as an intermediate court, from straying from established binding precedent cited above. We do not shirk our Constitutional role as the guardians of citizens' constitutional rights, even those who have been convicted of the most heinous crimes, and reject any statutory provision which, on its face or as applied, violates constitutional rights. But the separate powers of the judicial branch are tempered by the fact that the Constitution has delegated the separate power of primary policy making and crafting statutes to the legislative branch. Thus, any sweeping changes to Ohio's post-conviction system must be left to the legislature, not the courts.

**{¶64}** The situation before us does not present "the exceptional case" that warrants discovery. For example, although Group maintains that discovery was necessary to obtain medical records, Group had other avenues available to him to pursue those documents, as discussed in more detail below in the context of Group's fourth ground for relief, which alleges ineffective assistance of counsel for failing to present medical testimony about Group's alleged inability to use his right hand. First, Group could have executed a medical authorization directing his physicians, one of whom did not have his medical license at the time of trial, to provide current post-conviction counsel with his medical records. Second, Group's mother alleged in her affidavits that she had given trial counsel those records. Thus, Group had two ways to obtain his medical records, which could have been attached to his post-conviction petition, along with an affidavit from any physician, who could opine on whether or not the damage to Group's right hand would affect his ability to fire a weapon with both hands.

**{¶65}** Further, although Group contends it is unlikely that trial counsel would willingly provide an affidavit admitting his or her ineffectiveness, this is not outside the realm of possibility. See, e.g., *State v. Jackson* (1980), 64 Ohio St.2d 107, 110, 18 O.O.3d 348, 413 N.E.2d 819 (where trial counsel filed affidavit claiming he had

insufficient time to provide the defendant effective counsel.) Moreover, in order to be entitled to use discovery tools to obtain information from trial counsel, a petitioner must, at minimum, provide more than conclusory allegations regarding trial counsel's ineffectiveness, which Group has not done here.

{¶66} Accordingly, for all of the above reasons Group's discovery argument is meritless.

## Denial of Post-Conviction Relief

{¶67} In his first assignment of error, Group asserts:

{¶68} "The Trial Court Erred and Abused its Discretion by Granting Summary Judgment to the State, and Dismissing Appellant's Petition for Post-Conviction Relief."

{¶69} Pursuant to R.C. 2953.21(A)(1)(a), a person convicted of a criminal offense who asserts a violation of his or her constitutional rights may petition the court that imposed the sentence for appropriate relief. A post-conviction petition is not an appeal of the underlying matter; instead, it is a civil action that collaterally attacks a criminal judgment. *State v. Steffen* (1994), 70 Ohio St.3d 399, 410, 639 N.E.2d 67. State post-conviction review is not a constitutionally protected right, even in capital cases, thus, the petitioner only receives those rights established by statute. Id.

{¶70} To prevail on a claim for post-conviction relief, the petitioner must demonstrate a denial or infringement of his rights in the proceedings resulting in his conviction that rendered the conviction void or voidable under the Ohio or United States Constitutions. R.C. 2953.21(A)(1). A post-conviction petitioner bears the initial burden of demonstrating, via the petition, any supporting affidavits, and the trial record, that there are "substantive grounds for relief." R.C. 2953.21(C), *State v. Jackson* (1980), 64 Ohio St.2d 107, 111, 413 N.E.2d 819. A post-conviction claim is subject to dismissal without a hearing if the petitioner fails to support the claim with evidentiary material setting forth sufficient operative facts to demonstrate substantive grounds for relief. R.C. 2953.21(C) and (E). Hence, a criminal defendant challenging his conviction via a petition for post-conviction relief is not automatically entitled to a hearing. Id., see, also, *State v. Cole* (1982), 2 Ohio St.3d 112, 113, 443 N.E.2d 169.

**{¶71}** The purpose of the post-conviction relief statute is to provide criminal defendants with a clearly defined method by which they may raise claims of denial of federal rights. *State v. Calhoun* (1999), 86 Ohio St.3d 279, 281, 714 N.E.2d 905, citing *Young v. Ragen* (1949), 337 U.S. 235, 239, 69 S.Ct. 1073, 1074, 93 L.Ed. 1333. Conversely, a post-conviction petition is not a forum to relitigate issues that could have been raised on direct appeal. See *Steffen*, 70 Ohio St.3d at 410; *Cole*, 2 Ohio St.3d at 113. Accordingly, many claims are barred by res judicata.

**{¶72}** "Under the doctrine of res judicata, a final judgment of conviction bars a convicted defendant who was represented by counsel from raising or resurrecting issues in collateral review that could have been raised and fully litigated on direct appeal. *State v. Reynolds* (1997), 79 Ohio St.3d 158, 161, 679 N.E.2d 1131; *State v. Perry* (1967), 10 Ohio St.2d 175, 226 N.E.2d 104, O.O.2d 189, 10 Ohio St. 175, 226 N.E.2d 104, paragraph nine of the syllabus. Where, however, an alleged constitutional error is supported by evidence that is de hors the record, res judicata will not bar the claim because it would have been impossible to fully litigate the claim on direct appeal. *State v. Smith* (1985), 125 Ohio App.3d 342, 348, 708 N.E.2d 739." *State v. Green*, 7th Dist. No. 02 CA 35, 2003-Ohio-5142, at ¶21.

**{¶73}** "Evidence outside the record by itself, however, will not guarantee a right to an evidentiary hearing. To overcome the res judicata bar, the evidence must show that the petitioner could not have appealed the constitutional claim based on the information in the original trial record." *State v. Combs* (1994), 100 Ohio App.3d 90, 98, 652 N.E.2d 205, citing *Cole*, 2 Ohio St.3d at syllabus.

**{¶74}** Further, evidence de hors the record must meet a minimum level of cogency in support of the claim so as to require a hearing. *Combs* at 98, citing *Cole,* 3 Ohio St.3d at 115. Accordingly, although in "reviewing a petition for postconviction relief * * *, a trial court should give due deference to affidavits sworn to under oath and filed in support of the petition, [it] may, in the sound exercise of discretion, judge the credibility of the affidavits in determining whether to accept the affidavits as true statements of fact." *State v. Calhoun* (1999)*,* 86 Ohio St.3d 279, 714 N.E.2d 905, syllabus. Thus, "[t]he trial court

may, under appropriate circumstances in postconviction relief proceedings, deem affidavit testimony to lack credibility without first observing or examining the affiant. That conclusion is supported by common sense, the interests of eliminating delay and unnecessary expense, and furthering the expeditious administration of justice." Id. at 284.

{¶75} In assessing the credibility of such affidavits, the trial court should consider all relevant factors including: "(1) whether the judge reviewing the postconviction relief petition also presided at the trial, (2) whether multiple affidavits contain nearly identical language, or otherwise appear to have been drafted by the same person, (3) whether the affidavits contain or rely on hearsay, (4) whether the affiants are relatives of the petitioner, or otherwise interested in the success of the petitioner's efforts, and (5) whether the affidavits contradict evidence proffered by the defense at trial. Moreover, a trial court may find sworn testimony in an affidavit to be contradicted by evidence in the record by the same witness, or to be internally inconsistent, thereby weakening the credibility of that testimony.

{¶76} "Depending on the entire record, one or more of these or other factors may be sufficient to justify the conclusion that an affidavit asserting information outside the record lacks credibility. Such a decision should be within the discretion of the trial court." Id. at 284-285.

{¶77} And even when "the evidence passes this minimum threshold of showing a constitutional claim that could not have been raised on direct appeal, the court may still deny a hearing if it finds that based on all the files and records, there are no substantive grounds for relief. R.C. 2953.21(C). For example, a person other than the petitioner may submit an affidavit raising a claim of ineffective assistance of trial counsel based on evidence not presented at trial. If, however, that evidence is cumulative of, or alternative to, material presented at trial, the court may properly deny a hearing." *Combs*, at 98, citing *State v. Powell* (1993), 90 Ohio App.3d 260, 270, 629 N.E.2d 13; *State v. Post* (1987), 32 Ohio St.3d 380, 387-389, 513 N.E.2d 754.

{¶78} Here, Group's post-conviction petition is largely based upon claims of

ineffective assistance of trial counsel. In order to demonstrate ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373.

{¶79} The petitioner bears the burden of proof in proving ineffectiveness because in Ohio, a properly licensed attorney is presumed competent. *Calhoun*, 86 Ohio St.3d at 289. The ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases are "only guides" with regard to counsel's effectiveness. *Bobby v. Van Hook* (2009), 130 S.Ct. 13, 17, 175 L.Ed.2d 255. "* * * The Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices.'" Id., quoting, *Roe v. Flores-Ortega* (2000), 528 U.S. 470, 479, 120 S.Ct. 1029, 145 L.Ed.2d 985.

{¶80} In order to overcome the presumption of counsel's competence, the petitioner must submit sufficient operative facts or evidentiary documents demonstrating that the petitioner was prejudiced by the ineffective assistance. *State v. Davis* (1999), 133 Ohio App.3d 511, 516, 728 N.E.2d 1111. To demonstrate prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. It is not unreasonable to require that a petitioner demonstrate prejudice before an evidentiary hearing is granted. *Calhoun*, 86 Ohio St.3d at 283.

{¶81} With regard to the proper standard of review that a court should apply when reviewing a trial court's dismissal of a post-conviction petition without a hearing. we recognize there is a split among Ohio appellate districts. See *State v. Hicks*, 4th Dist. No. 09CA15, 2010-Ohio-89, at ¶9-11 (citing cases.) Following our own precedent, which is in line with the majority of Ohio's appellate districts, we will apply an abuse of discretion standard of review. *West*, supra, at ¶22, 28.

*First Ground for Relief*

{¶82} In his first ground for relief, Group alleges that trial counsel was ineffective for failing to properly prepare for a pretrial hearing on a motion to disqualify the Mahoning County prosecutor's office. The basis of the motion was the prosecutor's interception of Group's outgoing mail from Mahoning County Jail while he awaited trial. The trial court concluded that this claim is barred by res judicata, or in the alternative, that Group failed to demonstrate actual prejudice from the alleged error. We agree. Group's claim is based in large part on the record; he cites to several pages of the trial transcript to support his argument that counsel was not properly prepared and was admonished by the court for that lack of preparation. Group lists the following as de hors the record support for this claim: (1) an affidavit of attorney-expert Annette Powers; (2) his own affidavit.

{¶83} However, Group's affidavit, which is offered in support of other claims as well, offers little, if anything, to support this particular claim. At paragraph 47, Group avers: "During the pretrial preparation portion of the case, my defense lawyers told me that they did not want to vigorously litigate pretrial motions for fear of angering the judge and the prosecutors." Even ignoring the fact that Group's statement is based upon hearsay, and obviously self-serving, it lends no additional outside support to his claim that trial counsel was ineffective for failing to adequately prepare and argue a motion to disqualify the prosecutor's office. Similarly, Group's statement at paragraph 59 of his affidavit: that "[t]he trial record reflects [trial counsel Andrew Love's] lack of preparedness to vigorously defend my case," offers no de hors the record support.

{¶84} In Attorney Powers' affidavit, she presents a comprehensive recitation of death penalty law in Ohio. She then concludes that Group's trial attorneys were ineffective, stating broadly:

{¶85} "Upon review of the facts of the Scott Group case, it is my opinion that Mr. Group's counsel provided ineffective assistance of counsel during voir dire and at the trial and penalty phases of Group's capital trial. As a result of his counsel's ineffectiveness, Mr. Group was prejudiced."

{¶86} Notably, nothing in Attorney Powers' affidavit provides any specific criticism regarding trial counsel's performance during the pretrial hearing at issue in the first

ground for relief. Moreover, a number of Ohio appellate districts have concluded that an affidavit by a legal expert does not constitute cogent evidence de hors the record so as to overcome res judicata. *State v. Hill* (Nov. 21, 1997), 1st Dist. No. C961052 ("Attorney's affidavits explaining prevailing norms do not constitute evidence dehors the record and are akin to a notarized legal argument."); *State v. Davis*, 5th Dist. No. 2008-CA-16, 2008-Ohio-6841, at ¶161-162 (quoting *Hill* and advocating that instead of a countervailing attorney opinion, a more objective test for attorney ineffectiveness is that set forth in *Strickland*); *State v. Franklin*, 2d Dist No. 19041, 2002-Ohio-2370, at ¶12 ("the affidavit of an attorney giving an opinion based on facts in the record does not constitute evidence outside the record, but merely legal argument[.]"). Accord *State v. Jones*, 11th Dist. No. 2000-A-0083, 2002-Ohio-2074; *State v. Scudder* (1998), 131 Ohio App.3d 470, 722 N.E.2d 1054 (Tenth District); *State v. Lawson* (1995), 103 Ohio App.3d 307, 659 N.E.2d 362.

**{¶87}** And even if Powers' affidavit could be construed as cogent evidence de hors the record, its contents do not demonstrate why trial counsel's perceived deficient performance could not have been brought as an ineffective assistance of counsel claim on direct appeal. See *Combs*, supra, at 99-100. In fact, Powers was one of Group's attorneys for his direct appeal to the Ohio Supreme Court.

**{¶88}** And finally, even assuming arguendo that this claim is not barred by res judicata, Group cannot show prejudice. Group cannot show—even assuming counsel was ineffective—that there is a reasonable probability that the outcome of the guilt phase of trial would have been any different. As the court below aptly noted: "[t]he evidence of the guilt of Scott Group is overwhelmingly persuasive—a constellation of both direct and circumstantial evidence pointing convincingly and powerfully to Scott Group as the perpetrator, one who shot his victims in cold blood, and then later—from his jail cell— attempted to hire a hit man in order to eliminate and thereby silence the sole survivor." This evidence includes: Mrs. Lozier's eyewitness identification of Group, which was reliable considering that Group, as her wine deliveryman, was no stranger to her; blood on Group's shoe that matched the DNA of Mr. Lozier, the murder victim; the fact that,

while in prison, Group tried to enlist several others to falsify evidence and to eliminate or intimidate Mrs. Lozier; and the fact that the box of Ohio Wine invoices was missing from the Downtown Bar after the shootings.

{¶89} Accordingly, for all of the above reasons, the trial court correctly dismissed Group's first claim without holding a hearing.

*Second Ground for Relief*

{¶90} In his second ground for relief, Group alleges that trial counsel was ineffective for failing to properly argue a pretrial motion for a gag order. He notes that trial counsel failed to watch a news reel video before presenting it to the court in support of the motion, and that the trial court admonished counsel for the lack of preparation. Group cites directly to the trial court record in support of this claim, and also relies on Powers' affidavit.

{¶91} The trial court correctly concluded that the affidavit supplied no apparent outside evidence in support of this claim and that it is therefore barred by res judicata. And moreover, as discussed, even if it were not res judicata, Group cannot demonstrate prejudice, especially considering that the trial court ultimately granted the defense's motion for a gag order. Accordingly, the trial court correctly dismissed Group's second claim without holding a hearing.

*Third Ground for Relief*

{¶92} In his third ground for relief, Group argues that trial counsel was ineffective for "misleading" the jury, during opening statements, into believing that defense would present a DNA expert at trial. Group specifically asserts: "The failure to provide the promised DNA expert caused the defense to lose all credibility because the DNA results were material and outcome determinative. The State's DNA results, if scientifically valid, place Petitioner at the scene of Mr. Lozier's murder." Again, Group cites directly to the record in support of this claim. He also cites to Powers' affidavit. For all of the aforementioned reasons, the trial court correctly concluded this claim is barred by res judicata. And moreover, as discussed, even if it were not res judicata, Group cannot demonstrate prejudice. Accordingly, the trial court correctly dismissed Group's third claim

without holding a hearing.

*Fourth Ground for Relief*

**{¶93}** In his fourth ground for relief, Group asserts that trial counsel was ineffective for failing to obtain and present an expert witness regarding the alleged physical impairment of Group's right hand. Group's trial counsel did raise the issue of Group's injury to his right hand and the corresponding defense that Group was physically unable to fire a gun with that hand. Group testified that he had been shot in the right hand during the 1980's, suffered nerve damage, underwent several surgeries and lost function in that hand. Group's defense team did not present any experts or documentary evidence to support this, however, which is the crux of this ineffective assistance of counsel claim.

**{¶94}** In support of this claim, Group presented the affidavit of his mother, Ruth Group, in which she asserted that Group's trial defense team was informed that as a result of the past injuries Group was allegedly unable to hold a gun and fire it. Ruth further stated that her son's right hand "could be used for 'helping' to hold and lift things, but he had no strength in that hand for gripping" because of the injury. Ruth claimed she delivered Group's medical records to trial counsel but that they were not presented to the jury. She also stated that one of her son's former physicians was subpoenaed by the defense, but did not end up testifying, because, as the defense team told her, the man no longer held a medical license.

**{¶95}** The trial court concluded that this claim was barred by res judicata, or alternatively, that Group could not show prejudice. The court could have reasonably concluded that Ruth Group was not credible, and that the claim was therefore barred by res judicata. More importantly, Group cannot demonstrate prejudice. Even if the defense team had presented an expert who opined that Group could not have fired a weapon with his right hand, there is no reasonable probability that the outcome would have been any different, for the reasons outlined above, and additionally considering that Mrs. Lozier testified that Group held the gun with *both* hands:

**{¶96}** "Q. Would you describe or demonstrate again how the assailant held the gun?

**{¶97}** "A. I know it was with both hands.

**{¶98}** "Q. Constantly?

**{¶99}** "A. Yes, from what I can remember."

**{¶100}** Accordingly, the trial court correctly dismissed Group's fourth claim without holding a hearing.

*Fifth Ground for Relief*

**{¶101}** In his fifth ground for relief, Group challenges the trial court's use of an anonymous jury system. The trial court concluded that this claim was barred by res judicata, and that regardless it was meritless. This claim is barred by res judicata: it is based entirely on the record and could have been raised as an issue on direct appeal but was not. The only evidence presented in support of this claim was the Powers Affidavit, which, as discussed, does not constitute cogent evidence de hors the record.

**{¶102}** Further, it is unclear from the record whether the identities of the venirepersons were truly kept from defense counsel. During trial the court did state to the jury:

**{¶103}** "Ladies and gentleman, as I've indicated, we are going to be referring to you not by name, but as a number. Please do not take that personally, but it will be easier for us to follow along in responding to you."

**{¶104}** However, the record reflects that, after trial, on May 18, 2000, Group, via Attorney Renee Green filed a motion to unseal the list of juror names. The State responded that it had no objection to the unsealing of the juror's names. It asserted, however, that both defense (trial) counsel and the State had possession of the lists containing the names and addresses of the jurors and that both sides were permitted to inspect the verdict forms signed by all twelve jurors. The State claimed the lists were kept only from the *public*, and reasonably so, considering that Group had attempted to have the sole identification witness killed.

**{¶105}** The very next entry in the docket, dated September 28, 2000, seems to resolve the issue. It states:

**{¶106}** "PER SUPREME COURT OF OHIO, COPIES OF SEALED DOCUMENTS

SENT TO ATTORNEY RENEE GREEN [RM]"

{¶107} From this entry we conclude that the juror names and addresses were provided to Group's first post-conviction attorney. But regardless, even if there had been a truly anonymous jury, this claim could have been raised on direct appeal and is res judicata. Accordingly, the trial court correctly dismissed Group's fifth claim without holding a hearing.

*Sixth Ground for Relief*

{¶108} In his sixth ground for relief, Group asserts that trial counsel was ineffective for failing to adequately prepare Group for cross-examination, which resulted in Group opening the door to impeachment by the State when he falsely denied a past robbery conviction. In support of this claim, Group cites to the trial record itself and Powers' affidavit. For all of the reasons previously discussed, the trial court correctly concluded this claim was not supported by evidence de hors the record and was therefore barred by res judicata. And moreover, as discussed, even if it were not res judicata, Group cannot demonstrate prejudice. Accordingly, the trial court correctly dismissed Group's sixth claim without holding a hearing.

*Seventh Ground for Relief*

{¶109} In his seventh ground for relief, Group assets that trial counsel was ineffective for opening the door to Group's testimony about the letters to Adam Perry, the jail-mate Group solicited to firebomb Mrs. Lozier's house. In this claim, Group also asserts that trial counsel was ineffective for failing to object when the prosecutor questioned Group about his incriminating letters to Adam Perry. The trial court correctly concluded that this claim was barred by res judicata. In support of this claim, Group cites to the trial record itself and Powers' affidavit. And moreover, as discussed, even if it were not res judicata, Group cannot demonstrate prejudice. Accordingly, the trial court correctly dismissed Group's seventh claim without holding a hearing.

*Eighth Ground for Relief*

{¶110} In his eighth ground for relief, Group asserts that trial counsel was ineffective during the penalty phase of trial; he contends that mitigation was incongruent,

inconsistent and incomplete.  This claim is also barred by res judicata.  The only de hors the record evidence presented by Group in support of this claim is Powers' affidavit.  And as the trial court noted, Group's heavy reliance on the ABA Standards is misplaced as those standards are not dispositive indicators of constitutionally effective assistance of counsel.  See *Bobby*, supra, 130 S.Ct. at 17.  Accordingly, the trial court correctly dismissed Group's eighth claim without holding a hearing.

*Ninth Ground for Relief*

**{¶111}**  In his ninth ground for relief, Group asserts that trial counsel was ineffective for failing to voir dire the jury effectively regarding mitigating factors and for failing to rehabilitate jurors.  Again, Group cites extensively to the record, and presents only Powers' affidavit as support outside the record.  The trial court correctly concluded that this claim is barred by res judicata.  Accordingly, the trial court correctly dismissed Group's ninth claim without holding a hearing.

*Tenth Ground for Relief*

**{¶112}**  In his tenth ground for relief, Group asserts that trial counsel was ineffective for failing to file a motion for change of venue and to voir dire the jury effectively regarding pretrial publicity.  In support of this claim Group attached several exhibits in support of this claim, namely two DVD's of news reports and several newspaper articles.

**{¶113}**  The State argues that many of the news accounts occurred during the course of trial, not before, and thus are irrelevant to Group's claim that trial counsel was ineffective for failing to file a pretrial change of venue motion.  With regard to the written news articles, the State is correct.  One very brief article notes Group's arrest and another discusses the interception of his mail while he was jailed pending trial.  Two articles concern actual trial coverage, and the remaining two concern police investigations about whether Group was connected to a separate murder case.  With regard to the DVD's, although the State discusses their content in its brief, our examination of the discs contained in the trial court record reveals they have no data written on them.

**{¶114}**  Looking then to the exhibits that we can review on appeal, i.e., the written

news articles, Group cannot demonstrate prejudice.

{¶115}  A motion for change of venue is governed by Crim.R. 18(B), and is left to the discretion of the trial court.  Crim.R. 18(B) provides:

{¶116}  "Upon the motion of any party or upon its own motion the court may transfer an action to any court having jurisdiction of the subject matter outside the county in which trial would otherwise be held, when it appears that a fair and impartial trial cannot be held in the court in which the action is pending."

{¶117}  "The mere existence of pretrial publicity is not a basis for granting a change of venue. *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, at ¶117.  By itself, even pervasive adverse pretrial publicity "does not inevitably lead to an unfair trial."  *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, at ¶58, quoting *Nebraska Press Assn. v. Stuart* (1976), 427 U.S. 539, 554, 96 S.Ct. 2791, 49 L.Ed.2d 683.  Rather, a defendant must show an atmosphere that is completely corrupted by press coverage.  See, e.g., *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600.  The exhibits presented do not reflect such an atmosphere and thus Group has not demonstrated how trial counsel's failure to file a change of motion venue prejudiced him.

{¶118}  Moreover, the Ohio Supreme Court has repeatedly held that a "careful and searching voir dire provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality."  *State v. Yarbrough*, 104 Ohio St.3d 1, 2004-Ohio-6087, 817 N.E.2d 845 at ¶61, quoting *State v. Landrum* (1990), 53 Ohio St.3d 107, 117, 559 N.E.2d 710.  Counsel's voir dire of the jury in this case is clearly within the record, and any deficiency therein should have been raised on direct appeal.  Accordingly, the trial court correctly dismissed Group's tenth claim without holding a hearing.

*Eleventh Ground for Relief*

{¶119}  In his eleventh ground for relief, Group asserts that trial counsel was ineffective for failing to adequately cross-examine several witnesses.  He claims that counsel failed to highlight inconsistencies in Mrs. Lozier's testimony and the medical

records regarding whether she lost consciousness during the crime. In his petition, Group states that Mrs. Lozier's medical records would be filed separately, under seal, in support of this claim. However, the docket reveals no such records were ever filed. Group also attached several unauthenticated photographs of Group, along with a police report containing the description of the assailant that Mrs. Lozier gave to the police from the hospital in an apparent attempt to demonstrate that Mrs. Lozier's description of Group did not match his actual appearance and that counsel was ineffective for failing to highlight this inconsistency. The photographs do not constitute cogent evidence, and even if they did, Group cannot show how counsel's performance prejudiced him. Even if counsel had highlighted the perceived inconsistencies, Mrs. Lozier was positive in her identification of Group.

{¶120} Under this ground for relief, Group also claims trial counsel was ineffective because she was unprepared to cross-examine the State's DNA expert. In support of this claim, Group offered Powers' affidavit and the affidavit of Group's mother, Ruth. As discussed, Powers' affidavit does not constitute cogent evidence de hors the record. And Ruth Group's affidavit offers little, if any, support for this claim.

{¶121} Specifically, Mrs. Group averred:

{¶122} "During my son's trial, the night before Ms. Yost, one of my son's trial lawyer's, was to cross-examine the State's DNA expert at trial, I was on the telephone with her.

{¶123} "During that call, Ms. Yost told me she had to excuse herself and get off the telephone so that she could read a book to prepare to cross-examine the DNA expert witness and evidence."

{¶124} Based on the factors espoused by the Ohio Supreme Court in *Calhoun*, supra, the trial court reasonably determined that Ruth Group lacked credibility, i.e., the affidavit relies on hearsay, and Mrs. Group clearly has an interest in the outcome of the case. Further, even taking these statements as true, they do not support a conclusion that trial counsel was ineffective. If anything, they demonstrate that counsel took reasonable efforts to prepare for trial. That is what the Ohio Supreme Court concluded

when it disposed of an identical ineffective assistance of counsel claim on direct appeal:

**{¶125}** "Group also suggests that his counsel did not prepare adequately before cross-examining the state's DNA expert witness. However, the record indicates that defense counsel researched the subject of DNA thoroughly before cross-examining the Cellmark expert. Group does not identify any mistakes made by defense counsel as a result of allegedly inadequate preparation." *Group*, supra at ¶145.

**{¶126}** The trial court correctly concluded this issue was barred by res judicata. Accordingly, the trial court correctly dismissed Group's eleventh claim without holding a hearing.

*Twelfth Ground for Relief*

**{¶127}** In his twelfth ground for relief, Group asserts that trial counsel was ineffective for failing to properly present witness testimony regarding the negative gunshot residue tests. The trial court concluded that this claim was barred by res judicata.

**{¶128}** Indeed in its Opinion, the Ohio Supreme Court addressed this claim:

**{¶129}** "Group further contends that counsel did not employ 'a scientific investigation unit' to show that Group did not fire a gun on January 18, 1997. But Group fails to show either prejudice or deficient performance. As to prejudice, there is no way for us to tell whether the results of such testing would have helped Group's case. As to performance, counsel's performance cannot be characterized as deficient, because the record indicates that no valid test was possible.

**{¶130}** "Officer Lou Ciavarella testified that he performed a gunshot residue test on Group's hands on the afternoon of January 18, 1997. However, Ciavarella's test took place at 3:25 p.m., more than four hours after the shooting. According to Ciavarella's unchallenged testimony, the Bureau of Criminal Identification and Investigation recommends that any gunshot residue test be done within two hours after a gun is fired because the residue tends to rub off a person's hands over time. Thus, a negative test would have been devoid of probative value." *Group* at ¶136-137.

**{¶131}** In support of this claim, Group did supply a report from BCI indicating that gunshot residue tests performed on Group were negative, and another which revealed

that no blood was found on Group's clothing. However, this evidence is immaterial; it was available at the time of trial and does not lend any new support to the claim that counsel was ineffective. Thus, the trial court correctly concluded this claim was barred by res judicata and correctly dismissed it without holding a hearing.

*Thirteenth Ground for Relief*

{¶132} Finally, in his thirteenth ground for relief, Group asserts that trial counsel was ineffective for failing to prepare alibi witnesses, and by failing to argue that another person was responsible for the crimes. With regard to the first assertion, Group presents his mother's affidavit, in which she states:

{¶133} "The witness preparation sessions were more like social gatherings than trial preparation sessions. Neither I nor any of the witnesses whom I was able to observe were prepared by sitting us down and asking us questions that we might expect from my son's lawyers and also from the prosecutors. Instead, there was a general group discussion with refreshments being served."

{¶134} The trial court reasonably concluded that this did not constitute cogent evidence de hors the record. Further, the trial court noted that the alibi defense was addressed by the Supreme Court on direct appeal, and that the Court concluded that such defense did not present an exceptional case to outweigh the evidence of guilt. *Group* at ¶86. Thus, even assuming that trial counsel's preparation of the alibi witnesses for trial was somehow lacking, Group cannot demonstrate prejudice.

{¶135} With regard to Group's claim that trial counsel was constitutionally ineffective for failing to argue at trial that another person was responsible for the crime, this claim is barred by res judicata as it is unsupported by evidence de hors the record and could have been raised on direct appeal. Moreover, this falls squarely into trial tactics, something that even a reviewing court on direct appeal will not generally second-guess. See *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, at ¶213. Accordingly, the trial court properly dismissed Group's thirteenth claim without holding a hearing.

**Conclusion**

{¶136} In sum, Group's assignments of error are meritless.  Discovery is not automatically afforded in post-conviction relief cases.  The trial court properly dismissed each claim without a hearing.  Accordingly, the judgment of the trial court is affirmed.

Waite, P.J., concurs in judgment only.

Vukovich, J., concurs.