# SUPREME COURT OF THE UNITED STATES

## DAVID BOBBY, WARDEN *v.* ROBERT J. VAN HOOK

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 09–144.   Decided November 9, 2009

PER CURIAM.

The Court of Appeals for the Sixth Circuit granted
habeas relief to Robert Van Hook on the ground that he
did not receive effective assistance of counsel during the
sentencing phase of his capital trial.  Because we think it
clear that Van Hook's attorneys met the constitutional
minimum of competence under the correct standard, we
grant the petition and reverse.

I

On February 18, 1985, Van Hook went to a Cincinnati
bar that catered to homosexual men, hoping to find some-
one to rob.  He approached David Self, and after the two
spent several hours drinking together they left for Self's
apartment.  There Van Hook "lured Self into a vulnerable
position" and attacked him, first strangling him until he
was unconscious, then killing him with a kitchen knife
and mutilating his body.  *State* v. *Van Hook*, 39 Ohio St.
3d 256, 256–257, 530 N. E. 2d 883, 884 (1988).  Before
fleeing with Self's valuables, Van Hook attempted to cover
his tracks, stuffing the knife and other items into the body
and smearing fingerprints he had left behind.  Six weeks
later, police found him in Florida, where he confessed.

Van Hook was indicted in Ohio for aggravated murder,
with one capital specification, and aggravated robbery.  He
waived his right to a jury trial, and a three-judge panel
found him guilty of both charges and the capital specifica-
tion.  At the sentencing hearing, the defense called eight
mitigation witnesses, and Van Hook himself gave an

unsworn statement. After weighing the aggravating and mitigating circumstances, the trial court imposed the death penalty. The Ohio courts affirmed on direct appeal, *id.*, at 265, 530 N. E. 2d, at 892; *State* v. *Van Hook*, No. C–85–0565, 1987 WL 11202 (Ohio App., May 13, 1987) *(per curiam)*, and we denied certiorari, *Van Hook* v. *Ohio*, 489 U. S. 1100 (1989). Van Hook also sought state post-conviction relief, which the Ohio courts denied. *State* v. *Van Hook*, No. C–910505, 1992 WL 308350 (Ohio App., Oct. 21, 1992) *(per curiam)*, appeal denied, 66 Ohio St. 3d 1440, 608 N. E. 2d 1085, rehearing denied, 66 Ohio St. 3d 1470, 611 N. E. 2d 328 (1993); *State* v. *Van Hook*, 70 Ohio St. 3d 1216, 639 N. E. 2d 1199 (1994).

Van Hook filed this federal habeas petition in 1995. The District Court denied relief on all 17 of his claims. *Van Hook* v. *Anderson*, No. C–1–94–269 (SD Ohio, Aug. 7, 2003), App. to Pet. for Cert. 123a, 163a. A panel of the Sixth Circuit reversed, concluding that Van Hook's confession was unconstitutionally obtained under *Edwards* v. *Arizona*, 451 U. S. 477 (1981). See *Van Hook* v. *Anderson*, 444 F. 3d 830, 832 (2006). The en banc Sixth Circuit vacated that ruling, holding the confession was proper, and it remanded the case to the panel to consider Van Hook's other claims. See *Van Hook* v. *Anderson*, 488 F. 3d 411, 428 (2007). Van Hook petitioned for a writ of certiorari, which we denied. *Van Hook* v. *Hudson*, 552 U. S. 1023 (2007).

On remand, the panel granted Van Hook habeas relief again, but on different grounds, holding that his attorneys were ineffective during the penalty phase because they did not adequately investigate and present mitigating evidence, neglected to secure an independent mental-health expert, and requested and relied on a presentence investigation report without objecting to damaging evidence it contained. See *Van Hook* v. *Anderson*, 535 F. 3d 458, 461 (2008). The en banc Sixth Circuit again vacated the

panel's opinion, but rather than hearing the case a second time it remanded for the panel to revise its opinion. See *Van Hook* v. *Anderson*, 560 F. 3d 523, 524 (2009). In its third opinion, the panel—relying on guidelines published by the American Bar Association (ABA) in 2003—granted relief to Van Hook on the sole ground that his lawyers performed deficiently in investigating and presenting mitigating evidence. See *id.*, at 525. The State petitioned for a writ of certiorari. We grant the petition and reverse.

## II

Because Van Hook filed his federal habeas petition before April 24, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 do not apply. See *Lindh* v. *Murphy*, 521 U. S. 320, 327 (1997). Even without the Act's added layer of deference to state-court judgments, we cannot agree with the Court of Appeals that Van Hook is entitled to relief.

## A

The Sixth Amendment entitles criminal defendants to the "'effective assistance of counsel'"—that is, representation that does not fall "below an objective standard of reasonableness" in light of "prevailing professional norms." *Strickland* v. *Washington*, 466 U. S. 668, 686 (1984) (quoting *McMann* v. *Richardson*, 397 U. S. 759, 771, n. 14 (1970)). That standard is necessarily a general one. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." 466 U. S*.,* at 688–689. Restatements of professional standards, we have recognized, can be useful as "guides" to what reasonableness entails, but only to the extent they describe the professional norms prevailing when the representation took place. *Id.*, at 688.

The Sixth Circuit ignored this limiting principle, relying

on ABA guidelines announced 18 years after Van Hook went to trial. See 560 F. 3d, at 526–528 (quoting ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.7, comment., pp. 81–83 (rev. ed. 2003)). The ABA standards in effect in 1985 described defense counsel's duty to investigate both the merits and mitigating circumstances in general terms: "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." 1 ABA Standards for Criminal Justice 4–4.1, p. 4–53 (2d ed. 1980). The accompanying two-page commentary noted that defense counsel have "a substantial and important role to perform in raising mitigating factors," and that "[i]nformation concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant, as will mitigating circumstances surrounding the commission of the offense itself." *Id.*, at 4–55.

Quite different are the ABA's 131-page "Guidelines" for capital defense counsel, published in 2003, on which the Sixth Circuit relied. Those directives expanded what had been (in the 1980 Standards) a broad outline of defense counsel's duties in all criminal cases into detailed prescriptions for legal representation of capital defendants. They discuss the duty to investigate mitigating evidence in exhaustive detail, specifying what attorneys should look for, where to look, and when to begin. See ABA Guidelines 10.7, comment., at 80–85. They include, for example, the requirement that counsel's investigation cover every period of the defendant's life from "the moment of conception," *id.*, at 81, and that counsel contact "virtually everyone . . . who knew [the defendant] and his family" and obtain records "concerning not only the client, but also his parents, grandparents, siblings, and children," *id.*, at 83.

Judging counsel's conduct in the 1980's on the basis of these 2003 Guidelines—without even pausing to consider whether they reflected the prevailing professional practice at the time of the trial—was error.

To make matters worse, the Court of Appeals (following Circuit precedent) treated the ABA's 2003 Guidelines not merely as evidence of what reasonably diligent attorneys would do, but as inexorable commands with which all capital defense counsel "'must fully comply.'" 560 F. 3d, at 526 (quoting *Dickerson* v. *Bagley*, 453 F. 3d 690, 693 (CA6 2006)). *Strickland* stressed, however, that "American Bar Association standards and the like" are "only guides" to what reasonableness means, not its definition. 466 U. S., at 688. We have since regarded them as such.[1] See *Wiggins* v. *Smith*, 539 U. S. 510, 524 (2003). What we have said of state requirements is *a fortiori* true of standards set by private organizations: "[W]hile States are free to impose whatever specific rules they see fit to ensure that criminal defendants are well represented, we have held that the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." *Roe* v. *Flores-Ortega*, 528 U. S. 470, 479 (2000).

B

Van Hook insists that the Sixth Circuit's missteps made no difference because his counsel were ineffective even under professional standards prevailing at the time. He is

---

[1] The narrow grounds for our opinion should not be regarded as accepting the legitimacy of a less categorical use of the Guidelines to evaluate post-2003 representation. For that to be proper, the Guidelines must reflect "[p]revailing norms of practice," *Strickland,* 466 U. S., at 688, and "standard practice," *Wiggins* v. *Smith,* 539 U. S. 510, 524 (2003), and must not be so detailed that they would "interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions," *Strickland*, *supra*, at 689. We express no views on whether the 2003 Guidelines meet these criteria.

wrong.

Like the Court of Appeals, Van Hook first contends that his attorneys began their mitigation investigation too late, waiting until he was found guilty—only days before the sentencing hearing—to dig into his background. See 560 F. 3d, at 528. But the record shows they started much sooner. Between Van Hook's indictment and his trial less than three months later, they contacted their lay witnesses early and often: They spoke nine times with his mother (beginning within a week after the indictment), once with both parents together, twice with an aunt who lived with the family and often cared for Van Hook as a child, and three times with a family friend whom Van Hook visited immediately after the crime. App. to Pet. for Cert. 380a–383a, 384a–387a. As for their expert witnesses, they were in touch with one more than a month before trial, and they met with the other for two hours a week before the trial court reached its verdict. *Id.*, at 382a, 386a. Moreover, after reviewing his military history, they met with a representative of the Veterans Administration seven weeks before trial and attempted to obtain his medical records. *Id.*, at 381a, 386a. And they looked into enlisting a mitigation specialist when the trial was still five weeks away. *Id.*, at 386a. The Sixth Circuit, in short, was simply incorrect in saying Van Hook's lawyers waited until the "last minute." 560 F. 3d, at 528. Cf. *Williams* v. *Taylor*, 529 U. S. 362, 395 (2000) (counsel waited "until a week before the trial" to prepare for the sentencing phase).

Nor was the scope of counsel's investigation unreasonable.[2] The Sixth Circuit said Van Hook's attorneys found

_____

[2] In his brief in this Court, Van Hook also alludes to his counsel's failure to obtain an independent mental-health expert and their reliance on (and failure to object to harmful evidence in) a presentence investigation report—grounds on which the Sixth Circuit panel previously relied but which it abandoned in its final opinion. See *supra*, at

only "a little information about his traumatic childhood experience," 560 F. 3d, at 528, but that is a gross distortion. The trial court learned, for instance, that Van Hook (whose parents were both "heavy drinkers") started drinking as a toddler, began "barhopping" with his father at age 9, drank and used drugs regularly with his father from age 11 forward, and continued abusing drugs and alcohol into adulthood. App. to Pet. for Cert. 310a–312a, 323a–326a, 328a–330a, 373a. The court also heard that Van Hook grew up in a "'combat zone'": He watched his father beat his mother weekly, saw him hold her at gun- and knife-point, "observed" episodes of "sexual violence" while sleeping in his parents' bedroom, and was beaten himself at least once. *Id.*, at 321a, 338a–339a, 371a. It learned that Van Hook, who had "fantasies about killing and war" from an early age, was deeply upset when his drug and alcohol abuse forced him out of the military, and attempted suicide five times (including a month before the murder), *id.*, at 351a–353a, 372a. And although the experts agreed that Van Hook did not suffer from a "mental disease or defect," the trial court learned that Van Hook's borderline personality disorder and his consumption of drugs and alcohol the day of the crime impaired "his ability to refrain from the [crime]," *id.*, at 303a, and that his "explo[sion]" of "senseless and bizarre brutality" may have resulted from what one expert termed a "homosexual panic," *id.,* at 376a.

Despite all the mitigating evidence the defense did present, Van Hook and the Court of Appeals fault his counsel for failing to find more. What his counsel did discover, the argument goes, gave them "reason to suspect that much worse details existed," and that suspicion

———————

2–3. Van Hook now concedes, however, that neither ground is a "basis for issuing the writ," Brief in Opposition 5; see also *id.*, at 7, and accordingly we do not address them.

should have prompted them to interview other family members—his stepsister, two uncles, and two aunts—as well as a psychiatrist who once treated his mother, all of whom "could have helped his counsel narrate the true story of Van Hook's childhood experiences." 560 F. 3d, at 528. But there comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties. The ABA Standards prevailing at the time called for Van Hook's counsel to cover several broad categories of mitigating evidence, see 1 ABA Standards 4–4.1, comment., at 4–55, which they did. And given all the evidence they unearthed from those closest to Van Hook's upbringing and the experts who reviewed his history, it was not unreasonable for his counsel not to identify and interview every other living family member or every therapist who once treated his parents. This is not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face, cf. *Wiggins*, 539 U. S., at 525, or would have been apparent from documents any reasonable attorney would have obtained, cf. *Rompilla* v. *Beard*, 545 U. S. 374, 389–393 (2005). It is instead a case, like *Strickland* itself, in which defense counsel's "decision not to seek more" mitigating evidence from the defendant's background "than was already in hand" fell "well within the range of professionally reasonable judgments." 466 U. S., at 699.[3]

_____

[3] In addition to the evidence the Sixth Circuit said his attorneys overlooked, Van Hook alleges that his lawyers failed to provide the expert witnesses with a "complete set of relevant records or [his] complete psycho-social history." Brief in Opposition 4. But he offers no support for that assertion. He further claims that his counsel failed to obtain or present records of his military service and prior hospitalizations, but the record shows that they did review the former, see App. to Pet. for Cert. 380a, and that the trial court learned (from one of the written expert reports) all the relevant information Van Hook says it would have gleaned from the latter, see *id.*, at 373a–377a.

What is more, even if Van Hook's counsel performed deficiently by failing to dig deeper, he suffered no prejudice as a result. See *id.*, at 694. As the Ohio court that rejected Van Hook's state habeas petition found, the affidavits submitted by the witnesses not interviewed shows their testimony would have added nothing of value. See *State* v. *Van Hook*, No. C–910505, 1992 WL 308350, *2. Only two witnesses even arguably would have added new, relevant information: One of Van Hook's uncles noted that Van Hook's mother was temporarily committed to a psychiatric hospital, and Van Hook's stepsister mentioned that his father hit Van Hook frequently and tried to kill Van Hook's mother. App. to Pet. for Cert. 227a, 232a. But the trial court had already heard—from Van Hook's mother herself—that she had been "under psychiatric care" more than once. *Id.*, at 340a. And it was already aware that his father had a violent nature, had attacked Van Hook's mother, and had beaten Van Hook at least once. See also *id.*, at 305a (noting that Van Hook "suffered from a significant degree of neglect and abuse" throughout his "chaotic" childhood). Neither the Court of Appeals nor Van Hook has shown why the minor additional details the trial court did not hear would have made any difference.

On the other side of the scales, moreover, was the evidence of the aggravating circumstance the trial court found: that Van Hook committed the murder alone in the course of an aggravated robbery. See Ohio Rev. Code Ann. §2929.04(A)(7) (Lexis 2006). Van Hook's confession made clear, and he never subsequently denied, both that he was the sole perpetrator of the crime and that "[h]is intention from beginning to end was to rob [Self] at some point in their evening's activities." App. to Pet. for Cert. 295a; see *id.*, at 276a–278a, 294a. Nor did he arrive at that intention on a whim: Van Hook had previously pursued the same strategy—of luring homosexual men into secluded settings to rob them—many times since his teenage years,

and he employed it again even after Self's murder in the weeks before his arrest. See *id.*, at 279a, 295a, 374a. Although Van Hook apparently deviated from his original plan once the offense was underway—going beyond stealing Self's goods to killing him and disfiguring the dead body—that hardly helped his cause. The Sixth Circuit, which focused on the *number* of aggravating factors instead of their *weight*, see 560 F. 3d, at 530; cf. Ohio Rev. Code Ann. §2929.04(B), gave all this evidence short shrift, leading it to overstate further the effect additional mitigating evidence might have had.

\*    \*    \*

The petition for certiorari and the motion for leave to proceed *in forma pauperis* are granted. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

## DAVID BOBBY, WARDEN *v.* ROBERT J. VAN HOOK

### ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 09–144.　Decided November 9, 2009

JUSTICE ALITO, concurring.

I join the Court's *per curiam* opinion but emphasize my understanding that the opinion in no way suggests that the American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (rev. ed. 2003) (2003 Guidelines or ABA Guidelines) have special relevance in determining whether an attorney's performance meets the standard required by the Sixth Amendment. The ABA is a venerable organization with a history of service to the bar, but it is, after all, a private group with limited membership. The views of the association's members, not to mention the views of the members of the advisory committee that formulated the 2003 Guidelines, do not necessarily reflect the views of the American bar as a whole. It is the responsibility of the courts to determine the nature of the work that a defense attorney must do in a capital case in order to meet the obligations imposed by the Constitution, and I see no reason why the ABA Guidelines should be given a privileged position in making that determination.