POSNER, Circuit Judge.
Corvet Williams and Brian Austin were tried together for armed bank robbery and use of a firearm in a crime of violence, 18 U.S.C. §§ 2113(a), (d), 924(c)(1)(A), and were convicted by a jury. Their convictions were reversed, 576 F.3d 385 (2009), on a ground unrelated to the present appeals. They were retried, again convicted by a jury, and each sentenced to 684 months in prison. They appeal, challenging both their convictions and their sentences.
There were two robberies, two weeks apart, pretty obviously committed by the same two persons — so similar were the modus operandi of the robbers on the two occasions: two black men, one short and one tall, both brandishing pistols and wearing black gloves plus masks that covered the head completely except for eyes and mouth, with the shorter of the two men jumping over the teller counter to get the money while the taller pointed a silver-colored semi-automatic handgun held in his left hand at bank employees and cus *378 tomers, whom he had ordered to lie on the floor. And in each robbery the robbers had driven a stolen vehicle to the bank, left it with its motor running while they robbed the bank, and after the robbery driven away in another stolen vehicle, parked nearby.
Austin challenges his conviction on the ground that the evidence was insufficient to convict him beyond a reasonable doubt. That is the only challenge mounted by his lawyer. We permitted Austin to file a pro se brief complaining about the adequacy of his lawyer’s representation of him at the second trial, but that complaint has insufficient merit to warrant our extending this opinion to discuss it.
The principal witness against Austin (as against Williams) was Edward Walker, who testified that he’d been the getaway driver for the second robbery and so knew who the robbers were — and they were, he testified, his old friends Austin and Williams. He also testified that earlier those two had explained to him that they would be using two stolen cars in the robbery and Austin had told him that he had committed a previous robbery with Williams, also using two stolen vehicles. Another witness — Austin’s former girlfriend, with whom he’d broken up a couple of months before the robberies — testified that she had recognized him in the surveillance photos of the second robbery despite the mask.
Austin told the police when arrested that he had an ironclad alibi for the second robbery — he had been having a haircut while the bank was being robbed. But testimony by the barber, corroborated by phone records, placed the haircut an hour after the robbery. Another former girlfriend of Austin — his girlfriend at the time of the robberies — testified that Williams and Austin had been together in her apartment the morning of the robbery, before it occurred, and had left together.
Austin denied having participated in either robbery, but also testified that his hair had been cut at noon the day of the second robbery — which was 80 minutes after the robbery — and admitted that he’d been in his girlfriend’s apartment with Walker and Williams that morning.
He argues that the girlfriend who claimed to have recognized him in the surveillance photos could not have done so because of the mask, that she had testified against him out of spite, and furthermore that she already knew he was a suspect when she identified him from the photo. And he argues that Walker’s testimony should be disbelieved because Walker had been given immunity from prosecution in exchange for his testimony and therefore incurred no cost by implicating himself along with the defendants.
There was no evidence that the ex-girlfriend had testified out of spite — on the contrary, the evidence was that she had testified reluctantly. (No explanation was offered for why they’d broken up.) Although the mask covered Austin’s head almost completely, her testimony that she recognized him from the shape of his body and how he moved was not implausible, as she had known him for 18 years. (Had she not known him so well, there might be grave doubts about the reliability of her face-obscured identification. See A. Mike Burton et al., “Face Recognition in Poor-Quality Video: Evidence from Security Surveillance,” 10 Psychological Science 243, 245-48 (1999).) The identification was not suggestive, because she was shown just the surveillance photos and was asked only whether she could identify the masked man; she was not told that the police thought it was Austin, and he had not yet been arrested. It’s true that the police had searched her apartment the day *379 of the second robbery. But her roommate was Williams’s girlfriend at the time, and Williams had stayed in the apartment the night before, and we have no reason to think that Austin’s ex-girlfriend connected the search with Austin rather than with Williams.
Walker’s testimony against the defendants was self-serving, of course, but it was corroborated. The defendants’ argument that it was contradicted by neutral witnesses is incorrect; there were some discrepancies in witnesses’ testimony as there almost always are, but they were minor.
Austin did not make a wise choice in deciding to testify. He made crucial admissions, which when added to the ex-girlfriend’s testimony, Walker’s testimony, the testimony of Williams’s girlfriend, and the barber’s testimony entitled a reasonable jury to conclude that he was guilty beyond a reasonable doubt. And it is the cumulative probability of guilt created by all the evidence, rather than the probability of guilt created by a single piece of evidence, that is the touchstone in deciding whether a reasonable jury could find the defendant guilty beyond a reasonable doubt. United States v. Duarte, 950 F.2d 1255, 1260 (7th Cir.1991); United States v. Carson, 702 F.2d 351, 362 (2d Cir.1983). Suppose the prosecution submits three items of evidence of the defendant’s guilt (and the defendant submits no evidence of his innocence), and the probability that item 1 is spurious is 10 percent, the probability that item 2 is spurious is also 10 percent, and likewise item 3. The probability that all three are spurious (assuming that the probabilities are independent — • that is, that the probability that one piece of evidence is spurious does not affect the probability that another is), and therefore that the defendant should be acquitted, is only one in a thousand (.1 x .1 x .1). There is an analogy to calculating the risk of dying of some disease. Suppose the probability of finding oneself in a locale where the disease is common is 10 percent, the probability of catching the disease if one is in that locale is also 10 percent, and likewise the probability of dying if one catches it. The probability that one will die from the disease is again only one in a thousand. So the fact that there were infirmities in all the items of evidence against Austin does not indicate that the probability of his guilt fell short of the required threshold, which is proof beyond a reasonable doubt, implying a very high probability of guilt, though there is no agreement on what “very high probability” means in percentage terms in this context.
If the evidence against Austin was adequate, as we have just seen that it was, the evidence against Williams was overwhelming. The police stopped a vehicle a few hours after the second robbery. In it were Williams and his girlfriend. The police found bait bills from the robbed bank in the girlfriend’s purse. In addition, Williams was wearing muddy shoes and their tread matched footwear impressions left by one of the bank robbers; also the shoes were stained with a dye that was the color of the jumpsuit worn by the taller of the two robbers — Williams. And he admitted having testified in a previous proceeding to owning a chrome (and thus silver-colored) .25 caliber semi-automatic handgun, and such a gun was seized by police from the apartment of Williams’s girlfriend, where he had stayed the night before the robbery. Austin’s ex-girlfriend, who remember was the roommate of Williams’s girlfriend, identified the gun as Williams’s. There was additional evidence of his guilt, such as Walker’s testimony.
Williams contends, however, that the government impermissibly bolstered its case by calling his original lawyer as a *380 witness. The lawyer testified that Williams had mailed him an envelope marked “legal mail” (so that it would not be opened by the jail) that contained a sealed letter addressed to a cousin of Williams and a note asking the lawyer to forward the letter to Williams’s family to give to the cousin. The lawyer was suspicious and read the letter. It instructed the cousin to provide an alibi for Williams by testifying that Williams had been involved in a marijuana deal on the day of the robbery. Realizing that Williams was trying to obstruct justice by asking the cousin to provide him with a false alibi, the lawyer did not forward the letter. Instead, with the judge’s permission the lawyer withdrew as Williams’s counsel, turned the letter over to the government, and agreed at the government’s request to testify at Williams’s trial. He testified that the letter was a “blatant attempt to get me involved in smuggling something out of the jail that in turn would be a potential instrument for obstruction.” Williams, who like Austin had decided to testify, admitted on the stand that his aim in writing the letter had indeed been to induce his cousin to lie for him.
He argues that his lawyer did a terrible thing in turning against him as he did; indeed that the lawyer violated the Sixth Amendment right to effective assistance of counsel; and that the impact on the jury of the lawyer’s testimony must have been devastating. These are separate points and we shall discuss them separately.
There was no violation of the lawyer-client privilege. In asking the lawyer to forward the letter Williams was not soliciting legal advice or providing information that the lawyer might use in crafting Williams’s defense. “When information is transmitted to an attorney with the intent that the information will be transmitted to a third party ..., such information is not confidential.” United States v. Lawless, 709 F.2d 485, 487 (7th Cir.1983). For “an individual cannot purchase anonymity by hiring a lawyer to deliver his money or his messages.” In re Grand Jury Subpoena, 204 F.3d 516, 522 and n. 5 (4th Cir.2000).
The ethical rule applicable when the lawyer turned against Williams was the rule of the Northern District of Illinois that permitted a lawyer to “reveal ... the intention of a client to commit a crime,” N.D. Ill. L.R. 88.51.6(c)(2), although it did not require him to do so unless “it appeared] necessary to prevent the client from committing an act that would result in death or serious bodily harm.” Id. at 6(b). Oddly, the parties do not cite that rule, but instead the Northern District’s current rule, adopted in 2011, which, we are surprised to discover, is less protective of public safety. It permits a lawyer to reveal information relating to the representation of a client only in specified circumstances, such as “to the extent the lawyer reasonably believes [that revelation is] necessary (1) to prevent reasonably certain death or substantial bodily harm; (2) to prevent the client from committing a crime or fraud that is reasonably certain to result in substantial injury to the financial interests or property of another and in furtherance of which the client has used or is using the lawyer’s services; [or] (3) to prevent, mitigate or rectify substantial injury to the financial interests or property of another that is reasonably certain to result or has resulted from the client’s commission of a crime or fraud in furtherance of which the client has used the lawyer’s services.” ABA Model Rule of Professional Conduct 1.6(b)(l)-(3). The new Northern District rule adopts the ABA Model Rules of Professional Conduct. N.D. III. L.R. 83.50. But the current rule is not applicable to this case. The old *381 Northern District rule — the rule that is applicable to this case — placed no limitations on a lawyer’s reporting the intention of his client to commit a crime.
And more than an intention was involved. Williams had already committed the crime of attempting to suborn perjury by preparing the letter to his cousin and asking the lawyer to forward it, and he intended the further crime of actually suborning perjury. An unfulfilled intention to commit or suborn (that is, get someone else to commit) perjury is not a crime, but the intention plus a significant step toward completion, which Williams took, is a crime. And there is more than just suborning perjury in this case, because the cousin would have committed perjury had he agreed to Williams’s request, as would Williams had he testified to the false alibi. So we’re really talking about three crimes, one completed, two intended: suborning perjury; perjury by Williams; and perjury by the cousin. (The lawyer would have suborned perjury too had he delivered the note to the cousin after reading it, but that was never in the cards.)
The literature on the ethical duties of lawyers counsels that a lawyer should attempt to dissuade his client from illegal conduct before disclosing his client’s intentions to the court or to law enforcement authorities. But the literature phrases this as a recommendation rather than as a flat command, frequently hedging it with qualifications such as “ordinarily” and “practicable.” See, e.g., Restatement (Third) of Law Governing Lawyers § 120, comment g (2000); 2 Geoffrey C. Hazard & W. William Hodes, The Law of Lawyering § 29.21 (3d ed. 2011); ABA Model Rule 1.6, comment 14; ABA Model Rule 3.3, comment 6. This makes sense in the usual case; the harm to the client’s interests and to the attorney-client relationship from disclosure is great, and the benefit of disclosure in preventing criminal activity is usually small when the crime is perjury since the lawyer can refuse to introduce the perjured testimony. But this is not the usual case. Had Williams’s lawyer merely refused to forward the letter, Williams might have found a different means of conveying his unlawful request to his family (maybe orally in jail to a visiting family) — perhaps with instructions to find someone other than the cousin to be the false alibi witness, someone the lawyer had never heard of and therefore would have no basis for refusing to call as a witness. Facing a possible sentence of more than 50 years for the bank robberies and having already attempted to suborn perjury, Williams was unlikely to hearken to an ethics lecture by his lawyer.
This was not a case in which a client tells the lawyer that he would like to give testimony that the lawyer knows is a lie, and the lawyer tells him he must not do so and is confident the client will obey. Williams took a substantial step toward procuring a false witness and having embarked on that course had other means of reaching his destination even if the lawyer prevented the cousin from testifying. In such a case a lawyer is allowed to exercise discretion concerning whether to withdraw from representing the defendant and report the defendant’s crime of attempting to suborn perjury.
More important than what we think is that allowing the exercise of such discretion is consistent with the Northern District’s (old) rule of lawyer conduct, the rule applicable to Williams’s lawyer, which authorized the lawyer to “reveal ... the intention of a client to commit a crime.” Even ABA Model Rule of Professional Conduct 3.3(b), which the Northern District has now adopted, states, albeit in tension with the other one of the model rules that we quoted, that “a lawyer who *382 represents a client in an adjudicative proceeding and who knows that a person intends to engage, is engaging or has engaged in criminal or fraudulent conduct related to the proceeding shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal.” And in Nix v. Whiteside, 475 U.S. 157, 169, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986) (emphasis added), the Supreme Court said that “it is universally agreed that at a minimum the attorney’s first duty when confronted with a proposal for perjurious testimony is to attempt to dissuade the client from the unlawful course of conduct.” In other words, the lawyer’s minimum duty to the court — to the law — is to try to dissuade his client from committing perjury. The maximum would be to withdraw and testify against him. And the Court in Nix (like the other authorities on professional ethics on which William does or could rely) was dealing with a case in which a crime (perjury) had merely been proposed, rather than, as in this case, with a crime (attempted subornation of perjury) that had already been committed.
That is not a trivial distinction. “In tort law, unsuccessful attempts do not give rise to liability.... The criminal law, because it aims at taking dangerous people out of circulation before they do harm, takes a different approach. A person who demonstrates by his conduct that he has the intention and capability of committing a crime is punishable even if his plan was thwarted.” United States v. Gladish, 536 F.3d 646, 648-49 (7th Cir.2008). Williams is different from the client who merely proposes perjury, because his substantial step towards the crime “makes it reasonably clear that had [he] not been interrupted or made a mistake ... [he] would have completed the crime.” Id.
The Supreme Court in Bobby v. Van Hook, 558 U.S. 4, 130 S.Ct. 13, 17, 175 L.Ed.2d 255 (2009), criticized courts of appeals not only for relying on ABA guidelines that post-dated the relevant conduct but also for treating the guidelines “not merely as evidence of what reasonably diligent attorneys would do, but as inexorable commands.” Lawyers enjoy a broad discretion in responding to litigation misconduct by their clients, and in the unusual circumstances of this case we do not think the lawyer acted unethically.
Even if he did, it would not follow that his testimony was inadmissible, unless otherwise barred by the Federal Rules of Evidence, for example because deemed unduly prejudicial in relation to its probative value. Fed.R.Evid. 401. Exclusionary rules, which protect the guilty, are no longer favored. “Suppression of evidence ... has always been our last resort, not our first impulse. The exclusionary rule generates substantial social costs which sometimes include setting the guilty free and the dangerous at large.” Hudson v. Michigan, 547 U.S. 586, 591, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006); see also Sanchez-Llamas v. Oregon, 548 U.S. 331, 343-50, 126 S.Ct. 2669, 165 L.Ed.2d 557 (2006); Trammel v. United States, 445 U.S. 40, 50-51, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980). “Only communications subject to the attorney-client privilege cannot be disclosed under judicial compulsion,” Newman v. State, 384 Md. 285, 863 A.2d 321, 332 (2004) — and the privilege doesn’t extend to a client’s asking his lawyer to help him commit a crime. See also United States v. Zolin, 491 U.S. 554, 563, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989); In re Grand Jury, 475 F.3d 1299, 1305-06 (D.C.Cir.2007).
Rejection of an exclusionary rule does not mean that there is no remedy for misconduct by a lawyer. Defendant Williams — or for that matter a judge of *383 this court — can complain to the local bar association about the conduct of his original lawyer. Lawyers are subject to professional discipline up to and including disbarment, and the threat of discipline should deter willful violations. The reason for an exclusionary rule is not to make the defendant whole by putting him back in the position that he would have occupied had it not been for the violation. Exclusionary rules exclude improperly obtained evidence that often is highly probative of guilt. That is true in this case. And rather than being a victim deserving a remedy, Williams is a confessed attempted suborn-er of perjury.
Exclusionary rules should be reserved for cases in which there is no alternative method of deterrence. Professional discipline is an alternative. True, one can imagine a case in which the defendant’s former lawyer, having retired from practice and thus no longer being subject to professional discipline, offers to testify for the prosecution about client confidences. But in that case, either his testimony would be barred by attorney-client privilege or, if not, he could be compelled to testify under subpoena. ABA Model Rule 1.6, comment 13 (“lawyer may be ordered to reveal information relating to the representation of a client by a court”).
In this case, the lawyer’s testifying to his former client’s effort to enlist him in suborning perjury could not have violated Williams’s constitutional right to effective assistance of counsel. The lawyer was no longer Williams’s counsel when he testified; he had withdrawn as counsel and his right to do so is not questioned. Williams does not accuse the lawyer who represented him at trial (his original lawyer having withdrawn by then) of having rendered ineffective assistance of counsel. We can’t find any authority for holding that a lawyer’s actions after withdrawing from a litigation can give rise to a claim of ineffective assistance by a party he formerly represented — especially since, as just not-, ed, a lawyer may be ordered to reveal information relating to the representation of a client by a court. If we ordered a new trial, the government could subpoena the lawyer to testify again.
And if all this is wrong and there was error in allowing the lawyer to testify, it was harmless because the other evidence against Williams was overwhelming. Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). An error in a criminal case in which the defendant is convicted by a jury is harmless if without the error no reasonable juror would have voted to acquit. This is such a case. Although the eyewitness identification of Williams was not conclusive, if only because Williams was masked, the other evidence against him— the money, the shoes, the gun — constituted overwhelming evidence of guilt. Having convicted Austin on weaker though adequate evidence in an error-free trial, how could the jury in reason have acquitted Williams? Even when there is a denial of the constitutional right to effective assistance of counsel in a criminal trial, the rule of harmless error applies. The right to effective counsel protects a defendant from the risk of false conviction. “Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence.” Gideon v. Wainwright, 372 U.S. 335, 345, 83 S.Ct. 792, 9 L.Ed.2d 799, (1963), quoting Powell v. Alabama, 287 U.S. 45, 68-69, 53 S.Ct. 55, 77 L.Ed. 158 (1932). There is no risk that Williams was convicted falsely.
The jury may not even have given much weight to the lawyer’s evidence; the fact that a criminal defendant facing a long sentence tries to get a relative to give’ him a false alibi is not conclusive evidence of *384 guilt of the crime the defendant is being tried for — an innocent person, fearing that he would be convicted because the weight of the evidence was against him, might in desperation try such a ploy. That would be criminal, and an admitted willingness to commit another crime (remember that Williams admitted he’d attempted to obtain a false alibi from his cousin) could only hurt the defendant, but not necessarily critically, and not critically in this case in any event, because of the weight of the other evidence against him.
It’s true that the prosecutor said that the lawyer’s testimony was “essential” to its case. It wasn’t; it was an example of conduct by prosecutors that we have criticized in United States v. Ford, 683 F.3d 761, 767-68 (7th Cir.2012): prosecutors tend to pile on evidence of dubious admissibility or probative value even when the probative admissible evidence is overwhelming, because they want to guarantee a conviction and they know that even though no reasonable jury could acquit in the face of the probative admissible evidence, not all juries are reasonable.
Which means that the government should not have called the defendant’s former lawyer as a witness against his former client. The fact that it was his former lawyer testifying against him was likely to have a greater impact on the jury than the contents of his testimony warranted, since the contents were as we said not necessarily inconsistent with innocence. The prejudice was great in relation to the limited probative value, so the judge should have excluded the testimony under Rule 403. But a harmless error is not a permissible basis for reversing a conviction (which is why prosecutors pile on!).
The defendants complain finally about the length of their sentences. A sentence of 684 months- — 57 years — in a criminal justice system in which parole has been abolished is extraordinarily severe; the defendants were in their late 20s when sentenced, so in all likelihood will spend the rest of their lives in prison. But the only ground on which they challenge their sentences is that the judge was being vindictive in imposing them. The original sentences had been 646 months for Williams (the bottom of the applicable guidelines range) and 648 months for Austin (two months above the bottom). The judge in the second trial added 38 months to Williams’s sentence and 36 months to Austin’s, still within the guidelines range, which tops off at 711; but 684 months was the statutory maximum, and so the judge couldn’t go any higher.
When a judge imposes a heavier sentence on retrial than he’d imposed in the first trial and no legitimate reason for the heavier sentence is offered, a suspicion arises that the judge gave the heavier sentence because he was angry at the defendant for having appealed and gotten the judgment reversed and forced the judge to sit through another trial of the same charges. The Supreme Court has held that when the circumstances of the second sentencing “pose a realistic likelihood of ‘vindictiveness,’ ” the defendant is entitled to be resentenced unless the court is able to offer a legitimate justification for the higher sentence. Blackledge v. Perry, 417 U.S. 21, 27, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974); see also Wasman v. United States, 468 U.S. 559, 563-65, 104 S.Ct. 3217, 82 L.Ed.2d 424 (1984).
But in this case the original sentences were imposed by a different judge, so the fact that the sentences at the retrial were heavier does not give rise to an inference of vindictiveness. Texas v. McCullough, 475 U.S. 134, 140, 106 S.Ct. 976, 89 L.Ed.2d 104 (1986); United States v. Cheek, 3 F.3d 1057, 1064 (7th Cir.1993). *385 The Booker decision restored the sentencing discretion that the Sentencing Guidelines had removed, and the result is that different federal judges not infrequently give significantly different sentences for the same criminal conduct. Federal judges are now permitted to have their own penal theories, Spears v. United States, 555 U.S. 261, 265-66, 129 S.Ct. 840, 172 L.Ed.2d 596 (2009) (per curiam); United States v. Aguilar-Huerta, 576 F.3d 365, 367 (7th Cir.2009), and different penal theories are apt to generate different sentence lengths. The district judge who imposed the second sentences expressed particular concern, not inappropriately, with the defendants’ use of masks, which could greatly increase the difficulty of proving guilt; his predecessor had not mentioned the masks.
The defendants argue that the judge’s vindictiveness is evidenced by his having given the two defendants identical sentences despite the “unique circumstances” of each. (The first judge had given Austin a slightly higher sentence on the ground that he had played a bigger role in planning the robberies.) But perhaps because the defendants, though represented by different lawyers, filed a single opening brief and a single reply brief, they have never specified the differences between the defendants’ culpability that might have compelled a reasonable judge to give their clients different sentences. It would of course be awkward for a brief filed on behalf of both to argue that one should be given a shorter sentence than the other— and if they were given different sentences one sentence would have to be shorter than the other. The lawyers should have filed separate briefs with regard to the sentences.
The judgments are
Affirmed.