ED CARNES, Chief Judge,
concurring:
I join all of the Court’s opinion but write separately to emphasize how heavily Wilson’s criminal history weighs on the aggravating side of the sentencing scale. The weight on that side of the scale is an important factor that must be taken into account in determining whether the failure to present all available- mitigating circumstance evidence was prejudicial. See Bobby v. Van Hook, 558 U.S. 4, 11-13, 130 S.Ct. 13, 19-20, 175 L.Ed.2d 255 (2009); Reed v. Sec’y, Fla. Dep’t of Corr., 593 F.3d 1217, 1240-41 (11th Cir.2010); Hall v. Head, 310 F.3d 683, 705-06 (11th Cir.2002).
There is nothing inaccurate in the Court’s two-paragraph summary of the evidence that the jury heard about Wilson’s history of criminal behavior. Still, the district court’s more detailed and chronological recounting of that history, drawn from the evidence presented to the jury at sentencing, is worth quoting. It shows how continuously and relentlessly anti-social and violent Wilson was, beginning with his commission of arson when he was 12 years old and culminating in capital murder seven years later:
The State’s 22 witnesses in the sentencing phase of Wilson’s trial testified regarding Wilson’s lengthy criminal history and gang affiliation. The jury heard Wilson [D.O.B. July 29, 1976] started committing serious felonies when he was twelve and since then was “either out committing crimes or ... incarcerated somewhere.”
On January 31, 1989, twelve-year-old Wilson and two other boys started a fire in a vacant duplex apartment in Glynn County. The residents of the attached unit were home at the time. All three boys were charged with first degree arson and criminal trespass.
John J. Schrier testified he and his mother lived next door to Wilson in Glynn County in 1989. After Schrier’s mother, an elderly heart patient, complained that [twelve- or thirteen-year-old] Wilson was harassing her and her dogs, Schrier asked Wilson to leave his mother and her dogs alone. Wilson responded, “I’ll blow you and that old bitch’s head off.”
Former McIntosh County Sheriff’s Deputy Robert Wayne Hoyt testified that on December 16, 1991, fifteen-year-old Wilson shot Jose Luis Valle, a Mexican migrant worker. Brian Keith Glover testified he and his two cousins were with Wilson the night he shot Valle. According to Glover, they were standing in the parking lot of a convenience store when Valle, a stranger to them all, walked past and into the store. Wilson announced he was going to rob Valle and that he “wanted to see what it felt ■ like to shoot somebody.” Wilson, who had a pistol, approached Valle as he left the store. When Valle raised his arms in the air and turned to run, Wilson shot him in the buttocks. Glover testified that approximately one week after the incident, Wilson, who was again carrying *682 a gun, threatened him because of the statement Glover gave law enforcement about Valle’s shooting. Glover’s cousin, Oscar Woods, corroborated Glover’s story. The charges against Wilson were dead-docketed because the authorities were unable to locate Valle after he was discharged from the hospital.
After Wilson was charged with shooting Valle, he was incarcerated at the Claxton Regional Youth Development Center (“Claxton RYDC”), where he attacked Steve Nesmith, a youth development worker. Nesmith testified Wilson assaulted him, kneed him in the groin, grabbed his legs, and shoved him into a steel door. After a struggle, another worker and a detainee helped Nesmith subdue Wilson. Nesmith testified that during the two years he worked at the Claxton RYDC, Wilson was the only detainee who ever attacked him.
Daniel Rowe testified he attended school with Wilson. In January 1993, [sixteen-year-old] Wilson and another boy attacked him at school as he was drinking from a water fountain. Later the same day, the two again attacked him.
Corporal Craig Brown of the Glynn County Police Department testified that on June 9, 1993 [sixteen-year-old] Wilson shot and killed a small dog for no apparent reason. Juvenile Court Administrator Phillip Corbitt testified Wilson was charged with cruelty to animals and, at a June 25, 1993 arraignment, admitted shooting the dog.
On June 10, 1993, the day after he was charged with shooting the dog, Wilson was charged with possession of crack cocaine with intent to distribute.
A little more than one month later [and three days shy of his seventeenth birthday], Wilson shot Robert Loy Underwood. Underwood testified that on July 26, 1993 he drove into a neighborhood to look for day labor. While there, he purchased crack cocaine from two boys. As he drove' away, something struck him in the head. When he turned to see what had hit him, he saw Wilson, who was pointing a pistol at him. Wilson then shot five times into the cab of Underwood’s truck. One bullet struck Underwood in the head; another traveled through his arm and lung before lodging in his spine. Underwood said Wilson then “turned around and just casually walked off.” Underwood was hospitalized for six days. Wilson was charged with the shooting, and Underwood identified Wilson as the shooter during the juvenile proceedings.
Detective Ted McDonald with the Glynn County Police Department testified Wilson gave a statement in which he claimed he acted in self-defense when he shot Underwood. However, according to McDonald, Underwood’s wounds were not consistent with Wilson’s claims of self-defense. Juvenile Court Administrator Corbitt testified Wilson admitted shooting Underwood during a juvenile court hearing.
Sergeant Brandon Lee, an officer with the Georgia College Department of Public Safety in Milledgeville, testified that on May 25, 1995, not quite two months after Wilson’s release from the Milledge-ville YDC, he found [eighteen-year-old] Wilson and five others in a Georgia College parking lot shouting at college students. When Lee asked them to leave the campus, Wilson, whom Lee described as the obvious leader of the group, became belligerent. The group then moved to another parking lot two blocks away where they got involved in another verbal confrontation with students. When campus police arrived and again asked the group to leave the cam *683 pus, Wilson' began shouting “gang language” in Lee’s face and refused to leave. As Lee tried to place Wilson under arrest, Wilson charged another officer and attempted to grab the officer’s handgun. A struggle ensued, and Wilson ultimately had to be pepper sprayed. After the confrontation, Wilson was arrested and charged with failure to leave campus as directed by an officer and felony obstruction of an officer. Wilson pled guilty to the charges and was banned from the campus.
Steven Roberts, formerly a law enforcement officer with the Georgia College Department of Public Safety, testified that on August 1, 1995, Wilson [who had just turned nineteen] was charged with driving the wrong way on a one-way street and, because he ran when officers approached his car, obstruction of an officer. Roberts also testified- he saw Wilson on the Georgia College campus on September 28, 1995. Knowing he had been banned from the campus, Roberts approached [nineteen-year-old] Wilson to arrest him for trespassing. When instructed to place his hands on the car, Wilson ran.
Maxine Blackwell, Solicitor of Baldwin County State Court, testified Wilson had been charged with approximately ten misdemeanor offenses during an eleven week period in 1995 and was sentenced to serve 60 to 120 days in a detention center.
(Bracketed material added; citations to record and footnotes omitted.)
Wilson’s wholehearted commitment to antisocial and violent conduct from the age of 12 on not only serves as a heavy weight on the aggravating side of the scale, it also renders essentially worthless some of the newly proffered mitigating circumstance evidénce. For example, a number of Wilson’s teachers signed affidavits, carefully crafted by his present counsel, claiming that Wilson was “a sweet, sweet boy with so much potential,” a “very likeable child,” who was “creative and intelligent,” and had a “tender and good side.” One even said that Wilson “loved being hugged.” A sweet, sensitive, tender, and hug-seeking youth does not commit arson, kill a helpless dog, respond to a son’s plea to quit harassing his elderly mother with a threat “to blow ... that old bitch’s head off,” shoot a migrant worker just because he “wanted to see what it felt like to shoot someone,” assault a youth detention official, shoot another man in the head and casually walk off — all before he was old enough to vote.
■Without provocation Wilson shot a human being when he was fifteen, shot a second one when he was sixteen, and robbed and shot to death a third one when he was nineteen. Those shootings and his other crimes belie the story that his present counsel put forward in the affidavits from his former teachers, which are part of the new mitigating circumstance evidence. See Bobby v. Van Hook, 558 U.S. 4, 12, 130 S.Ct. 13, 19, 175 L.Ed.2d 255 (2009) (“[T]he affidavits submitted by the witnesses not interviewed show[] their testimony would have added nothing of value.”).
Given Wilson’s lifelong commitment to violent crime, and his utter indifference to human life, reasonable jurists could easily conclude, as the Georgia Supreme Court did, that there is no reasonable probability of a different result if his trial counsel had discovered and presented the additional mitigating circumstance evidence that he claims they should have.