In the

# United States Court of Appeals

### For the Seventh Circuit

———————————

No. 22-1910

ERIC BENSON SKEENS,

*Petitioner-Appellant,*

*v.*

RON NEAL,

*Respondent-Appellee.*

———————————

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:21-cv-00692 — **Damon R. Leichty**, *Judge.*

———————————

ARGUED NOVEMBER 5, 2024 — DECIDED AUGUST 4, 2025

———————————

Before SCUDDER, ST. EVE, and JACKSON-AKIWUMI, *Circuit Judges.*

JACKSON-AKIWUMI, *Circuit Judge.* Eric Skeens was convicted of five counts of child molesting in Huntington County, Indiana, and sentenced to 187 years in prison. With no physical evidence, the state's case against Skeens relied almost entirely on the trial testimony of the child victim, K.W. During closing arguments, Skeens's attorney told the jury, "I believe her," referring to K.W. This statement led Skeens to

include a claim of ineffective assistance of counsel in his post-conviction petition for relief.

The Indiana Court of Appeals found Skeens suffered no harm from his attorney's statement because K.W.'s compelling testimony, not his attorney's ambiguous and isolated statement, prompted the guilty verdicts. Skeens challenged this decision in a federal habeas petition that the district court denied. We too must deny relief because Skeens has not demonstrated that the Indiana Court of Appeals made any unreasonable determination of fact or law when deciding that Skeens suffered no prejudice from his attorney's imprudent remark.

## I

Except where noted, Skeens has not challenged the state court's factual findings, so it is appropriate for us to defer to those findings. *Goodloe v. Brannon*, 4 F.4th 445, 447 (7th Cir. 2021). We reproduce a portion of them below.

Skeens's trial took place in July 2009. At trial, K.W.'s mother testified that she married Skeens when K.W. was about four years old. The three lived together on Williams Street until K.W. and her mother—by then divorced from Skeens—moved to a new home when K.W. was eight years old. But even after K.W. and her mother moved away, Skeens continued to supervise the child while her mother was at work, spending an average of three nights a week with K.W.

As summarized by the state intermediate court on direct appeal, K.W.'s testimony at trial established the following:

> During the period of time between September 2007, when Skeens, Mother, and K.W. moved to Williams Street, and November 2008, Skeens

subjected K.W. to a variety of sexual encounters. Mother would be "either at the grocery store, some type of store or [] she was at work." Skeens removed both his and K.W.'s clothing and placed her on top of a bathroom sink, and he had sexual intercourse with K.W. which "hurt" K.W. Skeens placed a towel underneath K.W. "to wipe up white stuff that came out" of her vagina. Afterwards, Skeens would ask K.W. to go to the bathroom, and her vagina "kind of burned."

Also, Skeens would remove his and K.W.'s clothing in either the living room, Mother's bedroom, or the bathroom and "put his tongue" on K.W.'s vagina. When in either the living room or bedroom, Skeens would remove both his and K.W.'s clothing, and K.W. would be "laying down" on her back and Skeens was "[l]ike under [her] .... like under [her] legs sort of," which were "separated." Skeens would use his tongue to "lick []" K.W.'s vagina which felt "[w]et" and "[w]eird" to K.W. When Skeens would put his tongue on K.W.'s vagina in the bathroom, K.W. would be "in the same position" on top of the sink as when Skeens had sexual intercourse with her. Skeens would be "kind of squatting."

Further, Skeens would touch K.W.'s vagina with his fingers in the living room, the bathroom, and the bedroom. Skeens would remove his and K.W.'s clothes and "rub" her vagina "in circles" using one finger on each hand. Skeens

would also rub "the part of [K.W.'s vagina] where [she goes] potty" using one finger "on both hands and then sometimes two fingers."

Skeens would also make K.W. put his penis in her mouth in the living room and the bedroom. Skeens would remove his and K.W.'s clothes, and K.W. would lay on the floor on her back and Skeens would be "laying on top of [her] with his hands like sort of pushing up." Skeens would then put his "private" in K.W.'s mouth and "[h]e would sort of push." His "private" was "[s]ort of like a long type of mushroom shape," with "a triangle at the top with the top corner kind of curved" and a "hole." His penis felt "[w]eird" and "[k]ind of smooth."

Skeens would also touch K.W.'s "boobs" with his finger and his tongue. Skeens would remove K.W.'s and his own clothing and lick "sometimes one, sometimes both" of K.W.'s breasts. He would similarly "rub" either one or both of K.W.'s breasts with his finger.

During some of the incidents in the living room when Skeens would touch K.W.'s "privates" with "[h]is tongue, his finger and ... his private," Skeens would show K.W. movies "that had people touching each other." He would show K.W. the movies, including one called "real sex," on a "flat screen" television by "download[ing] [them] from his computer...." The movie would depict "three or four people and they were touching each other[']s privates."

> There was one incident when Skeens tried to
> touch K.W., and K.W. told Skeens "no," and she
> attempted to "go downstairs and [she] was like
> on the first step and then [Skeens] said if you
> don't come back here and do this with me, I'll
> call the police on you and they'll tell your
> mom." K.W. "went back [because she] was
> scared." Skeens then "touch[ed] [K.W.'s] pri-
> vates."

*Skeens v. State*, 932 N.E.2d 258 (Table), 2010 WL 3332137, at *1–
2 (Ind. Ct. App. Aug. 25, 2010) (citation modified) ("*Skeens I*").

In addition to calling K.W. and her mother to testify, the
state put on Sadie Landrum, K.W.'s elementary school coun-
selor. Landrum explained that after Landrum showed K.W.'s
class a video about sexual abuse titled "Breaking the Silence,
Children Against Child Abuse," K.W. "raised her hand and
whispered, 'this happened to me.'" Landrum reported K.W.'s
statement to the Department of Child Services.

Nicole Allen, a family case manager at the Department of
Child Services, testified that she interviewed K.W. about the
possible abuse the same day. Allen described K.W.'s responses
as age-appropriate and recalled that K.W. "gave a lot of infor-
mation, very detailed information about the abuse." K.W.'s
therapist, Lynn Baker, testified that K.W.'s behavior in therapy
"reflect[ed] [] a child [in] extreme[] emotional pain. The farther
we move [into] what's actually happened in the abuse the more
painful she feels." K.W.'s mother added that after reporting the
abuse, K.W. developed "behavioral issues," including night-
mares and bedwetting.

The state put on Sharon Robinson, the sexual assault nurse who had examined K.W., to explain the lack of physical evidence at trial. Robinson testified that there is only a short window to collect viable DNA samples from young victims of sexual abuse. Because she examined K.W. "past the time frame," Robinson did not collect any DNA samples.

At the conclusion of testimony, Skeens's attorney, Richard Thonert, gave a short closing argument that aligned with his general trial strategy: asserting that the state had not produced enough evidence to sustain a conviction. But he also seemed to credit K.W.'s testimony:

> We submit that you may return a verdict of not guilty based upon the unsubstantiated testimony of [K.W.]. There is nothing to use corroborate what she said. There is nothing to substantiate. Now, it doesn't mean that you cannot believe her, if you were in a civil court, you certainly could. **I believe her**, it's more likely than not, but clearly under the standard of clear and convincing evidence, or probably. But in a criminal court, we're submitting that as a juror you should require some, you should require corroboration to exclude any reasonable doubt. That degree of certainty of guilt beyond a reasonable doubt.

The jury returned a verdict of guilty on all counts. Thereafter, the trial court sentenced Skeens to an aggregate sentence of 187 years.

Skeens filed a direct appeal to the Indiana Court of Appeals presenting several grounds for relief. *Skeens I*, 2010 WL

3332137, at *1. That court denied him relief, a decision the Indiana Supreme Court later declined to review. *See Skeens v. State*, 940 N.E.2d 829 (Table) (Ind. 2010). Skeens fared no better with his state habeas petition. The state trial court denied his post-conviction petition in 2020, the state appellate court affirmed that decision, the state supreme court declined review, and the U.S. Supreme Court denied certiorari. *See Skeens v. Indiana*, 163 N.E.3d 284 (Table), 2020 WL 7019315, *2–6 (Ind. Ct. App. Nov. 30, 2020) ("*Skeens II*") (affirming the Huntington Circuit Court's denial of relief); *Skeens v. Indiana*, 171 N.E.3d 614 (Table) (Ind. 2021) (denying review); *Skeens v. Indiana*, 142 S. Ct. 722, 211 L. Ed. 2d 405 (2021) (denying certiorari).

Having exhausted his claims in state court, Skeens turned to federal court. *Skeens v. Warden*, No. 21-CV-692, 2022 WL 1404666 (N.D. Ind. May 4, 2022). The district court also denied Skeens relief, finding that he had not shown that the Indiana Court of Appeals had unreasonably applied any federal law or reached any unreasonable factual conclusion. *Id.*

Skeens requested a certificate of appealability from our court, which we granted. The sole issue Skeens raises on appeal is whether he received ineffective assistance of counsel when his attorney told the jury, "I believe her."

## II

The Sixth Amendment entitles a defendant facing criminal charges to "effective assistance of counsel—that is, representation that does not fall below an objective standard of reasonableness in light of prevailing professional norms." *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009) (citation modified). To demonstrate ineffectiveness of counsel, a petitioner has the burden

to show that counsel's performance was deficient and that the deficiency prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Courts refer to the two prongs of this test as *Strickland* performance and prejudice. *See Gage v. Richardson*, 978 F.3d 522, 527 (7th Cir. 2020).

If we were to review Skeens's habeas petition directly, we would proceed to examining the *Strickland* issue as outlined above. However, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) limits our review of Skeens's habeas petition. *See Schriro v. Landrigan*, 550 U.S. 465, 473–74 (2007) (explaining AEDPA created a "substantially higher threshold" for federal habeas relief). By virtue of the Act, Skeens must show either: (1) that the state court's adjudication of his claim "resulted in a decision that was contrary to, or involved an unreasonable application of" Supreme Court law, or (2) that the state court's analysis "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(1)–(2).

Because the standards created by *Strickland* and Section 2254(d) are both highly deferential, "when the two apply in tandem, review is 'doubly' so." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). Taking the standards together, this appeal asks us to determine whether the Indiana Court of Appeals unreasonably determined any fact or unreasonably applied *Strickland* to Skeens's claims. *Id.* at 101.

### III

To assess Skeens's arguments, we look to the "last reasoned state-court decision." *Johnson v. Williams*, 568 U.S. 289, 297 n.1 (2013). Here, that is from the Indiana Court of

Appeals, which we refer to as "the state court" for the remainder of this opinion. *Skeens II*, 2020 WL 7019315, at *1. When we review that 2020 decision, our question is not whether we "agree with the state court decision or even whether the state court decision was correct," but instead "whether the decision was unreasonably wrong under an objective standard." *Dassey v. Dittmann*, 877 F.3d 297, 302 (7th Cir. 2017) (en banc).

Considering the prejudice prong, the state court concluded that "the evidence of Skeens's guilt was so substantial that it is not reasonably likely that trial counsel's ill-advised statement affected the result." *Skeens II*, 2020 WL 7019315, at *5. The state court considered the extensive, detailed testimony from K.W., which it found was fortified by testimony from K.W.'s counselor and K.W.'s mother. *Id.* On the other hand, the state court found counsel's "I believe her" comment, read in context, was an "isolated ambiguous sentence." *Id.* at *6. The state court found that the compelling nature of K.W.'s testimony, not any marginal bolstering of her testimony by counsel's statement, explained the guilty verdicts. *Id.* at *5–6; *see also Strickland*, 466 U.S. at 696 (explaining that a prejudice inquiry begins by accepting the unaffected findings and then assessing the effect of the complained of errors).

Skeens argues that it was unreasonable for the state court to describe the comment as ambiguous and isolated, and to conclude that he suffered no prejudice. Starting with the state court's description of the statement, Skeens insists it was unreasonable to describe counsel's statement as ambiguous based on the statement's plain words. As Skeens points out, his counsel said, "I believe her," full stop. But counsel's careless statement must be considered in the context of the closing argument. The surrounding sentences show counsel attempting to

explain that if the jury believed K.W., that could be enough to meet the lower "more likely than not" civil evidentiary standard but, in a criminal case, the jury "should require corroboration to exclude any reasonable doubt." So, although the jury could have heard counsel to be crediting K.W., it is also possible that the jury could have interpreted his comment to mean that even if the jury believed her, there was not enough to convict. It was not unreasonable for the state court to read the transcript as ambiguous.

Skeens concedes that the comment was a mere three words long and only uttered once, but he asserts that it was nonetheless unreasonable to describe the comment as isolated when it buttressed K.W.'s critical testimony. We take Skeens's point as one about the weighing of prejudice, rather than about the unreasonableness of describing the statement as isolated because Skeens admits the statement was "geographically isolated." Isolation aside, Skeens argues, the comment cut to the heart of the issue in the case—whether K.W.'s testimony was to be believed. On this, Skeens has a point. Accordingly, although it was not unreasonable for the state court to describe the comment as isolated, we must still evaluate the state court's assessment of the comment's effect on the verdict. We do so now.

Turning to the state court's application of the prejudice prong, Skeens argues that the state court unreasonably applied *Strickland* by failing to consider exculpatory evidence: that K.W. had watched pornography on her mother's computer, which could have been the basis for her knowledge of sex acts, and that K.W. began wetting the bed after reporting the sexual abuse, not immediately after suffering the abuse.

Neither piece of evidence undermines the state court's prejudice determination.

The state court found that even assuming K.W. watched pornographic films, Skeens had not explained how K.W. could have generated her detailed testimony solely from watching pornography. *Skeens II*, 2020 WL 7019315, at *3. Skeens provides us no reason to doubt the reasonableness of that conclusion because K.W.'s testimony included details that could not be derived from pornographic films. Namely, K.W. described how the sexual intercourse "hurt" and her vagina "kind of burned" afterwards. The court also considered testimony from K.W.'s mother that K.W. began experiencing nightmares and bedwetting. Although the court did not detail when the bedwetting began, it reasonably determined that the evidence added credibility to K.W.'s testimony. *Id.* at *5. Whether K.W. began experiencing nightmares and bedwetting immediately after being molested or after reporting the molestation (thereby reliving it), it was reasonable to consider the fact of bedwetting as adding credibility to K.W.'s testimony.

Here, the state court applied *Strickland* by analyzing the effect of counsel's "I believe her" statement on the evidence presented at trial. The court acknowledged that counsel's statement could have been interpreted to imply that K.W. should be believed. *Id.* at *5 n.3. But, considering the totality of the evidence, the court concluded it was not reasonably likely that counsel's statement affected the result given the independent weight of K.W.'s testimony. *Id.* at *5; *see also Richter*, 562 U.S. at 112 ("The likelihood of a different result must be substantial, not just conceivable."). The court reasonably followed *Strickland*. There is no need to delve into the details

of each piece of evidence because the state court "provided a terse but sufficient explanation" for why counsel's comment did not add significant weight to K.W.'s testimony. *Dassey*, 877 F.3d at 312. That is enough. It was not unreasonable for the state court to find that Skeens suffered no prejudice from his counsel's remark.

Like the state court, we find counsel's statement ill-considered, if not reckless. *See Skeens II*, 2020 WL 7019315, at *5 (describing counsel's statement as "ill-advised"). But because Skeens does not demonstrate the requisite prejudice, we do not reach counsel's performance. *Gage*, 978 F.3d at 527 (declining to reach the performance prong because the state court "did not unreasonably apply *Strickland*'s prejudice prong").

**IV**

The Indiana Court of Appeals did not unreasonably determine any fact or unreasonably apply *Strickland* when it concluded that there was no reasonable probability of a different outcome had Skeens's counsel not made his incautious comment. Accordingly, the judgment of the district court denying the habeas petition is AFFIRMED.