9/13/18

No Atty Skip
wfp -

STATE OF MAINE
AROOSTOOK,ss

UNIFIED CRIMINAL DOCKET
LOCATION: CARIBOU
DOCKET: AROCD-CR-17-00320

STATE OF MAINE )
)
)
)
)
vs. )
)
)
)
WAI CHAN )
Defendant )

ORDER ON MOTION
TO SUPPRESS

Pending before the court is Defendant's motion to suppress pursuant to M.R.U.Crim.P.41A. Specifically, Defendant seeks suppression of the out-of-court identification made by Karin Wong arguing it was the product of unduly suggestive procedures. Defendant also argues that the State failed to preserve an original video recording resulting in a discovery or *Brady* violation which further impaired his right of confrontation of Karin Wong and Karin Wong's out-of-court identification, and therefore requests the court to suppress the video and identification. Hearing on the motion was held September 5, 2018 at which testimony was received from Michael Clark, Patricia Cyr, Officer Kevin St. Peter of Caribou Police and Officer Ricky Pelletier of Caribou Police. Also admitted into evidence was State Exhibit 1, which was a CD containing two video's showing an individual entering and leaving the home where the crime allegedly occurred which was taken by a surveillance camera situated at a nearby convenience store. For the reasons set forth herein, Defendant's motion is denied.

FINDINGS OF FACTS

For the purpose of this motion the following findings of facts are made:

At approximately 9:15 pm on September 3, 2017 Karin Wong, who is the owner and proprietor of the Jade Palace, a local Chinese restaurant, made a report to Caribou Police that the home located at 904 Presque Isle Road had been broken into and a theft had been committed. This home was owned by Ms. Wong for the purpose of providing living arrangements for some of the cooks at her restaurant. Living in the home at that time were two cooks, "Jing" and "Mike". Because Jing and Mike spoke little or no English, Ms. Wong made the report on their behalf and provided translation during the police investigation.

1

The police were told by Ms. Wong that the home had been broken into sometime between 10 am and 9 pm on September 3rd, after Jing and Mike had gone to work at the restaurant. Upon their return home from work around 9 pm the cooks discovered that their home had been entered, ransacked and that a laptop computer, electric shaver, shoulder bag and a large sum of money had been taken. Ms. Wong reported that the residents of the home kept the key for the main entry door hidden in the entry way, suggesting that is how the perpetrator made entry.

When the police asked Ms. Wong and the victims if they had any suspects, Ms. Wong told them she thought it could be Wai Chan, the Defendant. Ms. Wong explained that Wai Chan had previously worked as a cook at the Jade for about two months, but about two weeks earlier he suddenly gave his notice that he was resigning and asked for his final paycheck. She did not know where Wai Chan had gone or was living in the two weeks since he quit work. But Ms. Wong told the police that while working for the Jade, Wai Chan also resided in the house at 904 Presque Isle Road and that he knew where the key was hidden and knew the schedule that the other cooks living in the home would be away at work. Ms. Wong also told the police that Wai Chan may have known that Mike kept a large sum of money in the home as Mike often spoke openly about financial matters. During the investigation Ms. Wong also told police that Wai Chan drove a 2006 silver Ford Taurus.

At the scene at 904 Presque Isle Road, the police saw no evidence of forced entry. Inside the home, things were in disarray and several dresser drawers were open with items strewn about. No fingerprint evidence was obtained. When the investigation was commenced by the police, Wai Chan was not an individual known to them, and his being a potential suspect was based on the information Ms. Wong provided. Based on this information, police decided to investigate whether adjacent stores had surveillance cameras that included a view of the home at 904 Presque Isle Road.

A few days later police, made contact with Mike's Quick Stop convenience store, which is located directly across the road from the home at 904 Presque Isle Road. Police spoke with Patricia Cyr, who was the store manager. Ms. Cyr confirmed that the store did have surveillance cameras that faced in the direction of the home across the street, and that the surveillance equipment retained digital video recordings. Police asked Ms. Cyr to review the recordings for September 3rd from morning (8 am) until dark. The testimony was not precise what the police asked Ms. Cyr to look for on the recording, but from the totality of the evidence it can be inferred she was asked to look for anything unusual, or anyone coming and going at unusual times. Ms. Cyr assigned this task to an employee, Ashley Michaud, and instructed Ashley to watch the video for the entire day, and to record on a sticky note all times when someone was seen coming or going from the house across the street.

Upon watching the video, Ashley flagged for Patricia three specific time entries; the first one at approximately 9:40 am when people were observed leaving the home; the second from shortly after 2 pm when a sole individual was observed parking a car in the driveway and then entering the home; and the third and final flagged recording being shortly after 4 pm when a sole

individual was seen leaving the home, walking to the parked car and then driving away. The video flagged for 9:40 am showing people leaving the home is consistent with the information provided by Ms. Wong that Jing and Mike left the home around 10 am to go to work at the restaurant.

Ms. Cyr watched the video recordings for the three time-entries flagged by Ashley Michaud. She did not watch any other video from September 3rd. Ms. Cyr called Caribou Police to report something had been found on the video recording system for September 3rd, and she then put onto a USB thumb drive, or similar device, copies of the two video recordings from 2 pm and 4pm. Ms. Cyr made no changes or enhancements to the two videos she recorded onto the thumb drive.

Pursuant to Ms. Cyr's call, Caribou Police Officer St. Peter met Ms. Cyr at the store and watched on the store's surveillance equipment the three video recordings that had been flagged by Ashley Michaud, and took from Ms. Cyr the thumb drive that contained the two recordings from 2pm and 4 pm. Police did not ask or instruct Ms. Cyr to provide any additional recordings or to save any of the digital data retained for September 3rd. Upon returning to the police station, the officer downloaded the two files onto the department's computer and stored them in a file designated for this investigation. Ms. Wong was then contacted and asked to come in to the station to review the videos.

On September 19th, Ms. Wong went to the police station where the Officer St. Peter played for her viewing the two recordings. The two recordings were played on the system's Windows media player, with no enhancement, and with no capability to enlarge or "zoom". The officer asked Ms. Wong to watch the videos and indicate whether she could identify anyone. The officer did not provide to Ms. Wong any names or other identification material. Upon watching both videos Ms. Wong told the officer she believed the individual seen in the videos was Wai Chan but she could not be sure. And she also told Officer St. Peter she believed the car seen in the video was Wai Chan's. At that point, the officer asked Ms. Wong if she would be willing to go to Mike's Quick Stop to watch the videos as the store's equipment had the capability to zoom. Ms. Wong agreed.

On September 21, Officer St. Peter took Ms. Wong to Mike's Quick Stop. On the store equipment, Ms. Cyr played for Ms. Wong the two recordings flagged for 2 pm and 4 pm. While playing the recordings, Ms. Wong asked Ms. Cyr to "zoom" or enlarge the images at various times and to also "stop" or "pause" the recording at various times. There is no data to record or establish to what degree the recording was enlarged. Upon viewing the "zoomed" recordings Ms. Chan made a positive identification that the individual seen in the two recordings was Wai Chan and the vehicle observed was his. Her identification was also based on mannerism and style of gait observed in the video. Ms. Wong also identified the shoulder bag being carried from the home by the suspect as belonging to one of the occupants of the house. Following Ms. Chan's watching the videos at the store, police did not ask or instruct Ms. Cyr to make any additional recordings and did not ask or instruct her to record or save any additional video material from September 3rd.

3

Copies of the two video recordings originally saved by Ms. Cyr were included and presented to the defense as part of the discovery. At some date following September 3rd, all data for September 3rd that had been retained on the store's surveillance equipment was automatically written over by the system and lost. Due to the capacity of the equipment, all data in the surveillance recording system is automatically written over as new data is received, unless the data is otherwise saved onto a permanent medium. This usually occurs after passage of two months but can vary depending on usage and volume of new data.

The surveillance recording system on the store's equipment is equipped with newer software that has "zoom" capability. "Zooming" of images or videos does not alter or change any of the images; it only enlarges what can be viewed. This software is proprietary to the equipment manufacturer/distributor. When copies of the two videos were made and delivered to Caribou Police, the proprietary software to enable "zooming" was not included. Hence, neither Caribou Police, nor the defense, were able to "zoom" or enlarge the two videos provided by Ms. Cyr. However, following the filing of Defendant's Motion to Suppress, Michael Clark, a representative of the distributor of the surveillance equipment, Inlution, was contacted. Mr. Clark provided Caribou Police with a copy of the same proprietary software that was on the convenience store's surveillance system which now allows the two videos originally provided by Ms. Cyr, as well as copies, to be zoomed or enlarged. The two videos were played and viewed during the suppression hearing, with the "zoom" capable software activated. Mr. Clark testified that the integrity of the videos does not appear to be compromised or altered. There is no evidence that Caribou Police or the State was knowledgeable about the technology required for zooming, or that they could obtain access to the proprietary software to enable zooming until after the Motion to Suppress was filed and the issues presented.

1. Was the out-of-court identification by Karin Wong the product of an unduly suggestive procedure and as such is unreliable?

Defendant asserts that the identification by Ms. Wong of Wai Chan as the individual observed in the two videos was the product of an unduly suggestive procedure. When a defendant challenges the reliability of a witness's identification on due process grounds, a two-part test is applied. *State v. Davis,* 2018 ME 116, ¶16. First, the defendant must prove, by a preponderance of the evidence, that the identification process was suggestive. Second, if the court finds the procedure was suggestive, the State then bears the burden of proving, by clear and convincing evidence, that in the totality of the circumstances the identification, although made under a suggestive procedure, is nevertheless reliable. *Id.* The purpose of the test is to protect a criminal defendant from the use against him at trial of an out-of-court identification that is conducive to an irreparable mistaken identification or so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable identification. *Davis,* at ¶ 17. A defendant can meet the burden by proving by a preponderance of the evidence that the identification procedure "tended to increase the likelihood of misidentification." *Davis,* at ¶ 18; citing *State v.*

4

*Kelly,* 2000 ME 107, ¶ 19. But in addition to proving the procedure was suggestive, a defendant making a due process argument must prove in the initial step that the suggestive procedure was precipitated by improper state conduct. *Davis,* at ¶ 19. Defendant in this case has failed to prove or establish that the identification process was suggestive and precipitated by improper state conduct.

It was Karin Wong who told the police the details about the crime, including where and when it occurred, and it was she who told the police that she suspected Wai Chan may have committed the crime. Wai Chan was an individual she knew, and one, as described by her, who potentially had knowledge, opportunity, and ability to access the home. It was she who provided to police a description of Wai Chan's car. Conversely, Wai Chan was not an individual known to the police. Police viewed Wai Chan as a suspect only because of the information and identity provided by Ms. Chan.

Using the information, including timeline information, provided by Ms. Chan, the police sought out surveillance recordings to determine if any individuals could be seen coming or going from the home during the time period Ms. Wong indicated the crime was committed. Their search for surveillance video was productive, but the police did not know thê identity of the subject observed in the videos. So, the police went back to Ms. Wong and inquired if she could identify the individual.

Police did not tell Ms. Wong whom was in the video; indeed, police did not yet know the identity of the individual in the photo which is why they sought the help of Ms. Chan. At that time police had not yet even located or interviewed Wai Chan. Rather, Officer St. Peter merely asked Ms. Wong to watch the video and see if she could identify anyone. Upon watching the videos, Ms. Wong made a tentative identification, but made a more definite identification two days later when viewing the video "zoomed" or enlarged. But even at her second viewing of the videos, police did not indicate in anyway who the individual was. With Ms. Cyr operating the surveillance equipment, the video images were enlarged and paused at Ms. Wong's request, which led her to make a more definite identification.

This is not a case where police identified and honed in on a suspect whom they believed was responsible for the crime, and then presented images of that suspect to a witness whom may have witnessed either the crime or some other collateral aspect (i.e. driving away from a scene), and asked that witness to identify that suspect as the one they had previously observed. Instead, in this case, police had a name and other information from Ms. Wong, with it being her suggesting Wai Chan was the suspect. Police obtained video recordings of an individual entering the home during the timeframe the crime was believed to have been committed, but still had no identification. It was Ms. Wong who told the police that the man in the video was Wai Chan, and that it was he who she suspected committed the crime. In this case, the police did not set-up or establish a suggestive identification process. See *United States v. Williams,* 698 F.3d 374, 378 (7th Cir., 2012) where the court stated "The identification was not suggestive, because she was shown just the surveillance photos and asked only whether she could identify the masked man; she was not told the police thought it was (defendant), and he had not yet been

arrested." Accordingly, Defendant's motion that the out-of-court identification by Ms. Wong be suppressed as being the product of an unduly suggestive procedure is denied.

2. Did the failure to preserve the videos from the convenience store's surveillance equipment for all of September 3, 2017 violate Defendant's rights of due process?

Defendant also asserts that failure by Caribou Police to preserve all of the surveillance video for September 3, 2017 rather than just the two portions recorded at just after 2 pm and just after 4 pm violated his rights of due process and to a fair trial as well his ability to cross examine Ms. Wong. To protect a defendant's right to a fair trial, the prosecution has a duty to preserve material evidence. *California v. Trombetta,* 467 U.S. 479, 488 (1988). To determine whether the State's failure to preserve evidence violated a defendant's right to a fair trial, the trial court is required to conduct a bifurcated analysis. *State v. Cote,* 2015 ME 78, ¶ 15. First, the court must determine whether the evidence possessed an exculpatory value that was apparent before the evidence was destroyed. *Id.,* citing *Trombetta,* 467 U.S. at 489. If so, then the defendant must show only that the evidence was of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. *Id.* If, however, the exculpatory value of the evidence was not apparent at the time of loss or disappearance, the defendant cannot establish a constitutional deprivation without proof that the State also acted in bad faith in failing to preserve the evidence. *Id.*

In this case, the two videos from the surveillance system, the first showing an individual entering the home, and the second showing an individual leaving the home carrying a backpack, have been preserved. Presumably, these two preserved videos show the unauthorized entry to the home, during the timeframe the crime is alleged to have occurred. In other words, the two videos preserved were of inculpatory value.

The police also reviewed video taken at about 9:40 am showing individuals leaving the home. Individuals leaving the home at that time was consistent with the information already available to police that the two victims/occupants of the home, Jing and Mike, left the residence at about that time to go to work at the restaurant. This video was not preserved, but the court concludes the police interpreted the 9:40 am video as simply showing the departure of the two victims, Jing and Mike. It was relevant to establishing a timeline, but did not have either inculpatory or exculpatory value. To date, no exculpatory value has been identified regarding the 9:40 am video showing the victims leaving their home.

The surveillance system originally recorded and retained all activity of September 3, 2017. Caribou Police asked Ms. Cyr, as store manager, to review the surveillance video which contained in its view the 904 Presque Isle Road home for September 3, 2017 from 8 am until dark. Ms. Cyr assigned this task to Ashley Michaud with the instructions to watch the video and record on a sticky note all times when someone was seen coming or going. Ashley recorded

three times: 9:40 am when individuals were observed leaving; shortly after 2 pm when a car was observed to arrive and then an individual entered the home; and shortly after 4 pm when an individual was seen leaving the home. There is no evidence Ashley did not follow the instructions given to her by Ms. Cyr making it reasonable to infer the balance of the recorded video from September 3rd did not show any other entries or exits to the home or other such activity. And the police only reviewed the three entries flagged by Ashley. They did not view any other portions of the surveillance video. Other than the two videos from 2 pm and 4 pm that Ms. Cyr saved onto a thumb drive, no other video from September 3rd was preserved, and it was lost within a couple months of September 3rd when it was automatically written over by the system. But, there is not yet shown any apparent exculpatory value to the unpreserved video from September 3rd.

The Defendant cited *State v. Capps,* a case from the Court of Appeals of Tennessee, as authority for his assertion that destroyed/written over video violates his due process rights. 2009 Tenn. Crim. App. LEXIS 188. The *Capps* case is very different. In Capps, police initially had possession of video showing a store burglary being committed by a suspect who was of similar appearance to the defendant, but the investigating officer testified he was unsure if that suspect was the defendant. On that basis the court found factually that the video had exculpatory value. But in that case, the officer had returned the video to the store, without making a copy, against department policy, and the video was reused by the store, forever destroying the original material. The distinction with *Capps* is it involved video showing the crime which had exculpatory value that the police failed to preserve. In this case, the video showing the unauthorized entry has been preserved. And as previously discussed, the unpreserved video in this case has no apparent exculpatory value.

No exculpatory value being apparent with respect to the unpreserved video, the Defendant must show that the State acted in bad faith in failing to preserve the additional video. After Ms. Cyr reviewed the three videos flagged by Ashley, she down-loaded onto a thumb drive just the two videos form 2 pm and 4 pm, and then called the police. When Officer St. Peter arrived to meet with Ms. Cyr, she gave him the thumb drive and the officer then reviewed on the store surveillance equipment the three flagged videos. The officer did not ask for any additional recordings nor did he ask Ms. Cyr to preserve any additional portions. But at that time, Officer St. Peter reasonably believed he had a copy of everything material. Based on Ashley's review, the remaining video did not show anyone entering or leaving the home, or anything else unusual. This is not a case where police lost or misplaced evidence, and there is no evidence that police had any reason to think the unpreserved video was of value or usefulness.

In addition, there is no evidence the police knew the recordings on the store's system would automatically be written over and be lost within about two months. There is no suggestion the police intentionally failed to request the additional video be saved so it would be lost. This appears to be a situation where the police reasonably thought they had copies of all relevant and material video when they obtained the copies of the 2 pm and 4 pm videos.

7

In his motion, Defendant also argued the unavailability and destruction of the video has destroyed the ability to have the video "zoomed" as was done for Ms. Wong when she made her more definite identification on September 21st. But that concern has been obviated.

The surveillance system in the convenience store contained proprietary software that allowed for "zooming". When Ms. Cyr loaded the two videos onto a thumb drive, the zooming software was not included, which is a proprietary feature of the system. When police played the videos on their own equipment, the videos could be played in their normal configuration, but they could not zoom or enlarge because they did not have the zooming software. The Defense had the same issue with the copy of the videos provided with discovery. Not until Defendant raised the assertion he was prejudiced by the inability to zoom was the matter further investigated by the State. Until then, the inability to zoom had not been identified as an issue. And until they spoke with Mr. Clark, the police appear to have been unaware of the intricacies of the zoom software, and were unaware they could be provided with a copy of the software that would enable them to utilize the zoom feature.

Upon the issue being raised, police contacted Michael Clark, who is a representative of Inlution, the entity which distributed and serviced the surveillance system installed at Mike's Quick Stop. As Mr. Clark testified, he was able to provide and download onto Caribou Police computers the very same proprietary zooming software that the store's system contained. As was demonstrated at hearing, the videos can now be zoomed and enlarged. And importantly, the testimony of Mr. Clark establishes that utilization of the zooming feature does not change or alter the video; the zoom feature simply enlarges for viewing the identified area. The court is satisfied that viewing copies of the videos with the recently provided zoom-capable software is sufficiently similar to the process as was done on the store's system. Also, when using the zoom feature, there are no settings or calibrations (i.e. 2x magnification). So, whether Ms. Wong was to view the original videos on the surveillance system at the store or to view copies, although the zoom enlargement can be approximated, there is no way to exactly duplicate the degree of zoom or enlargement that was done by Ms. Cyr when Ms. Wong was shown the videos on September 21, 2017.

Base on all of the above facts, there is insufficient proof to establish that the State acted in bad faith by not taking steps to preserve the additional video from September 3, 2017. To the extent Ms. Wong's identification of Wai Chan was done with the videos zoomed or enlarged, the Defendant will be able to cross examine her at trial and he can utilize the zoom feature on the videos to test her identification. Defendant's due process rights and right to confrontation have not been violated.

In summary, the Defendant has failed to show that the unpreserved video possessed any exculpatory value that was apparent when the video was written over and lost, and has also failed to prove the State acted in bad faith in failing to preserve the remaining video from September 3, 2017. Defendant's due process rights and rights of confrontation have not been violated. Accordingly, Defendant's motion to suppress the two recorded videos and to exclude Ms. Wong's out-of-court identification is denied. In addition, at trial the zoom, or enlargement

feature, may be utilized when playing the videos, subject to any motions in limine that may be raised prior to trial.

Dated: September 13, 2018

_____
Justice, Superior Court